**COMMONWEALTH OF PENNSYL-VANIA, Plaintiff,**

v.

**Rogers C. B. MORTON, Secretary of the Interior, et al., Defendants.**

**Civ. A. No. 73-2188.**

United States District Court,
District of Columbia.

Sept. 13, 1974.

David L. Kurtz, Deputy Atty. Gen., Com. of Pa., Harrisburg, Pa., for plaintiff.

Myles E. Flint, Dept. of Justice, Washington, D. C., for federal defendants.

Jerome H. Gerber, Harrisburg, Pa., for private defendants.

## MEMORANDUM AND ORDER

CORCORAN, District Judge.

The plaintiff is the Commonwealth of Pennsylvania. The defendants are (1) the Secretary of the Interior; (2) the Director, National Park Service; (3) the National Gettysburg Battlefield Tower, Inc., and (4) Thomas R. Ottenstein. Defendants (1) and (2) are hereinafter referred to as the "federal defendants" and defendants (3) and (4) as the "private defendants."

The plaintiff seeks both declaratory and injunctive relief in a five-count complaint.

■ The Court's jurisdiction is premised upon 28 U.S.C. §§ 1331, 1332, 1361, 2201–2202; 42 U.S.C. § 4321 *et seq.*; and 16 U.S.C. § 470f (1970).[1]

Pending before the Court are motions for summary judgment by the defendants and plaintiff's opposition thereto. Upon consideration of the entire record herein and oral argument on the motions, the Court concludes that the· defendants' motion must be granted as to Count II; that Counts I, IV and V must be dismissed; and that for reasons stat-

---

1. Although plaintiff has failed to articulate it, the Court assumes throughout this opinion that the Commonwealth is also proceeding under § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, which provides:

   A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

   The federal defendants' challenge to the jurisdictional amount is not supportable. Illinois v. City of Milwaukee, 406 U.S. 91, 98, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).

ed hereinafter a remand to the Secretary of the Interior is deemed appropriate to aid in the ultimate resolution of Count III.

## I

The facts necessary to an understanding of this dispute follow.[2]

In 1970, the private defendants proposed to construct a 300-foot steel observation tower on private property immediately adjacent to the Gettysburg National Cemetery. Upon learning of the proposal, the National Park Service (NPS) became concerned as to its impact upon the battlefield park. Mr. George P. Hartzog of NPS registered his opposition. The private defendants then decided to relocate the tower, again on private property, at a site known as Colt Park, nearby to the site of Pickett's historic charge between Seminary and Cemetery Ridges. The NPS reiterated its previous objections, although recognizing that since the tower was to be located on private property, it, NPS, was without legal authority to prevent its construction. NPS was so advised by the office of the Solicitor of the Interior Department.

In early May, 1971, the private defendants began construction of the tower at Colt Park. Negotiations nevertheless continued between the NPS and the private defendants during the months of May and June. The negotiations culminated on July 2, 1971, in an "Agreement and Land Exchange" by which NPS granted to the private defendants a 200-foot right-of-way across federal park lands to a so-called Stonehenge site where the private defendants agreed to locate the tower.[3] The private defendants also agreed to convey the Colt Park site in fee to the federal government.

Like the Colt Park site, the Stonehenge site was, and is, private property lying outside the boundaries of the Gettysburg National Military Park.

On July 20, 1971, the Commonwealth of Pennsylvania brought suit against the private defendants in the Court of Common Pleas of Adams County in which the Stonehenge site is located. The Commonwealth sought to enjoin construction of the tower.[4] After lengthy proceedings, Judge MacPhail of the Court of Common Pleas on October 26, 1971, made a Finding of Fact that the "proposed tower at the proposed site will not irreparably damage the natural, historic, scenic or aesthetic values of the environment of the Gettysburg . . ." (III *Record* 495a), and refused to order injunctive relief. The Commonwealth filed exceptions to the MacPhail order on the ground that the Agreement violated federal law, not because it violated the National Environmental Policy Act, but because it had not been reviewed by the President's Advisory Council on Historic Preservation. On January 14, 1972, the Court again dismissed the exceptions to its refusal to grant injunctive relief. The Commonwealth then appealed to the Commonwealth Court, an intermediate appellate court.

Shortly thereafter, the President's Advisory Council on Historic Preservation reviewed the Agreement and concluded that the proposed tower would have an adverse effect on the Gettysburg scene, and that Interior should attempt to block its completion. (Reed Affidavit, Exhibit AA.)

Following the Advisory Council recommendations, the Secretary of the Interior, on May 26, 1972, notified plaintiff that the Agreement "did not in any

---

2. This recitation of facts is drawn from the federal defendants' "Statement of Material Facts," the affidavit of Nathaniel P. Reed and exhibits thereto.

3. The Agreement and right-of-way are discussed in Part III, *infra*.

4. In May, 1971, Pennsylvania citizens ratified a constitutional amendment, Article I, Section 27, P.S., charging the Commonwealth with the duty to maintain the natural, scenic, historic and aesthetic values of the environment. Plaintiff claims it has a duty to bring this action under that section as "public trustee."

way, by its specific terms or by implication, constitute an approval by (Interior) of the concept of the tower as a feature of the Gettysburg area scene, whether it is located at the Stonehenge site or any other site." However, the Secretary continued, it was Interior's belief that the Stonehenge site "would be less destructive of historic values than at the Colt Park site . . . ," and that the "agreement constituted an effort on our part to minimize the adverse effect of the tower on Gettysburg . . . . " (Reed Affidavit, Exhibit CC.) From that point forward, the federal defendants took all possible steps to prevent the erection of the tower even to the point of appearing as witnesses in the Pennsylvania proceedings.

The Commonwealth Court of Pennsylvania took cognizance of the Advisory Council opinion and remanded the case to Judge MacPhail. On July 27, 1972, Judge MacPhail reaffirmed his earlier opinion (III *Record* 623a), including a finding of fact that the Interior Department, by the terms of the Agreement had "sanction(ed) the erection of the proposed tower at the proposed site." (III *Record* 495a.) The case returned to the Commonwealth Court which on April 3, 1973, rejected plaintiff's appeal and affirmed *in toto* Judge MacPhail. Commonwealth v. National Gettysburg Battlefield Tower, Inc., 8 Cmwlth. 231, 302 A.2d 886 (1973). Plaintiff then petitioned the Pennsylvania Supreme Court. On October 3, 1973, the Supreme Court affirmed the order of the Commonwealth Court affirming Judge MacPhail. The Supreme Court also found that Article I, Section 27 of the Pennsylvania Constitution was not "self-executing." Commonwealth v. National Gettysburg Battlefield Tower,

Inc., 454 Pa. 193, 311 A.2d 588 (1973). Shortly thereafter, on December 18, 1973, plaintiff instituted the present action.[5]

## II

Against that background we turn to an examination of the complaint.

### A. *Count I*

■ This count is virtually identical to that previously processed through and dismissed by the Pennsylvania state courts. The prayer for relief is the same: *viz.*, to enjoin the private defendants from the construction of the proposed tower. Both complaints indicate that construction is continuing[6] on private property adjacent to the Gettysburg National Military Park; both complaints indicate that the erection of the tower would irreparably harm the natural and historic environment of the battlefield; and both complaints indicate that the plaintiff is proceeding under Article I, Section 27 of the Pennsylvania Constitution. Although it is true that the present complaint adds the federal defendants, it is also true that the essence of Count I is a prayer for relief directed only to the private defendants to enjoin construction of the tower. Under the familiar principles of the doctrine res judicata, Count I is clearly barred. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597, 68 S. Ct. 715, 92 L.Ed. 898 (1948), *citing* Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195 (1877). *See also* C. Wright, Federal Courts 50–51 (2d ed. 1970). Count I has been fully litigated in the Pennsylvania courts. There was the same subject matter, the same parties in interest and a final judgment on the merits adverse to plaintiff's claim.

---

5. The action has not progressed expeditiously. No motion for a temporary restraining order nor for a preliminary injunction has ever been filed. After the case became at issue, the usual discovery occurred. The parties then agreed that summary judgment motions of the defendants would be filed "on

or about June 1, 1974." By the time the parties agreed on a date for oral argument, both the tower and right-of-way were completed. Washington Post, August 18, 1974, at B1, col. 4.

6. *See* note 5 *supra*.

"It is obvious that the state courts would not allow retrial of this cause and neither will the federal courts." Township of Hopewell v. Volpe, 446 F.2d 167, 170 (3d Cir. 1971). Thus, it is clear beyond peradventure that Count I must be dismissed as barred by the doctrine of *res judicata.*

### B.  *Count II*

■ This Count attacks the authority of the federal defendants to enter into the Land Exchange Agreement. However, the legal authority to enter into such an agreement is specifically provided in 16 U.S.C. § 460*l*–22(b) (1970), which is set out in the margin.[7] Accordingly the defendants are entitled to summary judgment on this issue.[8]

### C.  *Count III*

Count III is discussed under Part III, *infra.*

### D.  *Count IV*

In Count IV, plaintiff claims that the failure of the federal defendants to seek congressional authorization to proceed by eminent domain and condemn the tower site was a "major federal action significantly affecting the quality of the human environment" and therefore should have occasioned the filing of an environmental impact statement under Section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S. C. § 4332(2)(C). As relief, plaintiff asks this Court to compel the filing of a NEPA statement and, further, to direct the federal defendants to condemn the property on which the tower is located.

■■ The Court need not reach the NEPA question as related to condemnation for plaintiff's requested relief to compel condemnation is clearly beyond this Court's jurisdiction. Mandamus will lie only to compel a ministerial act and not one committed to agency discretion. *See, e. g.,* United States v. Walker, 409 F.2d 477 (9th Cir. 1969); Powell v. Katzenbach, 123 U.S.App.D.C. 250, 359 F.2d 234 (1965), *cert. denied,* 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1966). *Cf.* Carlson v. Schlesinger, 364 F.Supp. 626 (D.D.C.1973). There is no federal statute which imposes the ministerial duty upon the federal defendants to condemn the tower site or, further, to seek legislation that would authorize condemnation of that site. The question as to whether legislation to condemn private property adjacent to the Gettysburg battlefield should be sought is one properly committed by our Constitution to the political branches of the Government, not to the Judiciary.[9] Accordingly, Count IV of plaintiff's complaint must be dismissed for failure to state a cause of action. Powell v. Katzenbach, *supra.*

---

7. 16 U.S.C. § 460*l*–22(b) :
  (b) The Secretary of the Interior is authorized to accept title to any non-Federal property or interest therein within a unit of the National Park System or miscellaneous area under his administration, and in exchange therefor he may convey to the grantor of such property or interest any Federally-owned property or interest therein under his jurisdiction which he determines is suitable for exchange or other disposal and which is located in the same State as the non-Federal property to be acquired
  . . . .

8. *But cf.* National Forest Preservation Group v. Butz, 485 F.2d 408 (9th Cir. 1973).

9. The Secretary of the Interior is authorized to condemn property for inclusion with the Gettysburg National Military Park. 16 U.S. C. § 430g. That authority is circumscribed, however, to the extent that the Park may not exceed 3,874 acres, and specific written authorization must be obtained from the respective House and Senate Committees with jurisdiction over the Interior Department before the NPS may proceed with condemnation of lands for inclusion within the boundaries of an established park. (Reed Affidavit, Exhibit J.) Thus, the record indicates that Interior gave at least some thought to condemnation. *See also* Reed Affidavit, Exhibit K.

### E. *Count V*

Plaintiff's Count V is generally a recapitulation of the preceding Counts I, II and IV. Only one portion of it raises a new claim, and that is that the federal defendants acted illegally because they "failed to permit the President's Advisory Council on Historical Preservation to comment on the impact the proposed project would have on the Park and have since disregarded the comments of the council with regard to the tower."

█ It is true that the Advisory Council was not consulted prior to the execution of the Land Exchange Agreement on July 2, 1971. However, the Department of the Interior did refer the Agreement to the Advisory Council on January 24, 1972, for its comments as required by 16 U.S.C. § 470f. (Reed Affidavit Exhibit Y.) As noted in Part I, *supra*, the Council concluded that the tower would have an adverse impact on the Gettysburg area and recommended that the Interior Department should attempt to block its construction. The federal defendants did make a bona fide effort to block the tower even to the extent of testifying for the plaintiff in the action before Judge MacPhail.

█ The Secretary substantially complied with 16 U.S.C. § 470f when he referred the Agreement to the Advisory Council for its comments. If he deviated from its recommendation, the Secretary was authorized to do so in his discretion by the express terms of the statute.[10] Accordingly, Count V also must be dismissed for failure to state a cause of action.[11]

### III

The object of plaintiff's lawsuit comes more clearly into focus under Count III.

In it, plaintiff avers that the action of the federal defendants in executing the "Agreement and Land Exchange" [12] on July 2, 1971, was a "major federal action significantly affecting the quality of the human environment," and that prior to taking said action, it was necessary to have prepared and filed an environmental impact statement in accord with Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C).

It should be emphasized at the outset that what we are dealing with in Count III is a right-of-way over federal land for a distance of some scant 200 feet, which has been built at no cost in effort, time, personnel or money to the federal government. We are not dealing with the impact of the privately-financed tower, located on private land, which is beyond the reach of this Court and as to which the Pennsylvania courts have already determined adversely to the plaintiff's claim of environmental injury. *See* Section I, *supra*.

There is no doubt that the execution of the Agreement providing for the right-of-way represents *some* federal action. Whether the plaintiff has standing to challenge that action on NEPA grounds is a threshold question. If standing is recognized then, of course, the Court must determine whether the action constituted "major Federal Action" which requires the filing of an impact statement under NEPA.

The federal defendants challenge the plaintiff's standing to sue alleging that the plaintiff cannot meet the "injury in fact" of the "zone of interests" tests to obtain judicial review under § 10 of the Administrative Procedure Act, 5 U.S.C. § 702. Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636

10. Moreover, the construction of the right-of-way, 22 feet wide and 200 feet long, was at no expense to the Federal Government. In view of dismissing the count, the Court need not determine whether the execution of the Agreement was the "issuance of any license" within the meaning of the statute.
    Paragraphs 47–49 of Count V appear to have been withdrawn by the plaintiff.

11. The doctrine of *res judicata* applies to bar this Count as well. *See* Part II.A. *supra.*

12. The complete text of the "Agreement and Land Exchange" is contained in Exhibit A to plaintiff's complaint.

(1972); Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S. Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

The Court is mindful, however, of the recent pronouncement of this Court of Appeals that "(s)tanding need not be founded on a rock; a pebble or even a cobweb may do." New Jersey Chapter Inc. of the American Physical Therapy Association, Inc. v. Prudential Life Ins. Co. of America, 502 F.2d 500, 504 (D.C. Cir. 1974).

■ This would seem to be particularly true when the case involves a state suing as *parens patriae* for alleged environmental injury on behalf of its citizens. *See, e. g.,* Illinois v. City of Milwaukee, *supra*; Missouri v. Illinois, 180 U.S. 208, 241, 21 S.Ct. 331, 45 L.Ed. 497 (1901); State of Alabama ex rel. Baxley v. Woody, 473 F.2d 10, 14–15 (5th Cir. 1973). In this case neither the injury in fact nor the zone of interest is well articulated in the pleadings, particularly as it relates to the use of the right-of-way as such. But, on the other hand, the road is there, it is in use and its presence does have *some* environmental effect; and it cannot be denied that a state on behalf of its citizens has some interest in the use of lands lying within its borders. Accordingly, we recognize standing.

This brings us to the question of whether an impact statement was required to be filed in the circumstances of this case.[13]

The Court cannot ignore the lofty purposes of NEPA and its action-forcing requirements that environmental values be taken into account by all Federal agencies at every discrete stage of the decision-making process. *See, e. g.,* Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). The agencies must conduct an environmental cost-benefit analysis of any proposed project, Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1332 (4th Cir.), *cert. denied sub nom.* Fugate v. Arlington Coalition on Transportation, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972), and consider possible "alternative" courses of action. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D. C. 5, 458 F.2d 827 (1972).

In view of NEPA's mandate, then, and the fact that no environmental impact statement was prepared by the federal defendants for the then-proposed "Agreement and Land Exchange," the Court concludes that a remand to the Secretary of the Interior "for further consideration of the environmental issue within the framework of NEPA" is appropriate.[14] Arizona Public Service Co. v. FPC, 157 U.S.App. D.C. 272, 280, 483 F.2d 1275, 1283 (1973).[15]

### IV

Accordingly, it is this 13th day of September, 1974,

Ordered and adjudged

1. That Count I of plaintiff's complaint is hereby dismissed with preju-

---

13. *See generally* F. Anderson, NEPA in the Courts (1973).

14. A remand in this instance also preserves the "integrity" of NEPA. Hanly v. Mitchell, 460 F.2d 640, 648 (2d Cir. 1972); City of New York v. United States, 337 F.Supp. 150, 160 (E.D.N.Y.1972).

The Court is not unaware that by taking such action it may be engaged in an exercise in futility. For even were it ultimately to decide that a NEPA statement was required, the only corrective action it could take would be to restrict the use of the right-of-way until adequate compliance with·NEPA

was accomplished. Such a restriction, it is conceded by all concerned, would have no effect whatsoever in the operation·of the tower as a tourist attraction.

15. The very sketchy outline by an associate solicitor of the Department of the Interior as to why an impact statement was not prepared, Reed Affidavit, Exhibit X, is clearly inadequate. It is not indicative of the "careful and informed decisionmaking" process" mandated by NEPA. *Calvert Cliffs',* *supra*, 146 U.S.App.D.C. at 39, 449 F.2d at 1115. Accordingly, the statement of reasons must be a determination by the Secretary.

dice as barred by the doctrine of *res judicata;*

. 2. That summary judgment is granted to the defendants as to Count II;

3. That Counts IV and V are hereby dismissed with prejudice for failure to state a cause of action;

4. That for purposes of ultimate disposition of Count III hereof, the cause is hereby remanded to the Secretary of the Interior for a statement by him of the reasons why, in his opinion, it was unnecessary to file an impact statement, such statement of reasons to be filed with the Clerk of the Court and served upon the plaintiff within 30 days of the date of this Order, and any objections or exceptions thereto by the plaintiff to be filed with the Clerk of the Court and served upon the Secretary of the Interior within 14 days thereafter.