MOUNTAIN STATES LEGAL FOUNDA-TION, a non–profit Colorado corporation, on behalf of its members, Plaintiff,

v.

Cecil D. ANDRUS, Secretary of the United States Department of the Interior; and Robert W. Bergland, Secretary of the United States Department of Agriculture, Defendants.

No. C78–165B.

United States District Court,
D. Wyoming.

Oct. 14, 1980.

Kea Bardeen and James G. Watt, Mountain States Legal Foundation, Denver, Colo., David B. Kennedy, Kennedy, Connor & Healy, Sheridan, Wyo., for plaintiff.

Gerald S. Fish, Dept. of Justice, Washington, D. C., Charles E. Graves, U. S. Atty., D. Wyoming, Cheyenne, Wyo., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

This case involves areas of over one million acres in the Western Overthrust Belt in non–wilderness portions of United States forests in Wyoming, Idaho and Montana, on which oil and gas lease applications have been pending several years without action by the Secretary of the Interior who referred the applications to the Secretary of Agriculture for a recommendation on issuance, which has never been made. Plaintiff, as a non–profit corporation, represents interests of the public and its members in eight mountain states who it claims are irreparably injured by the delay or prevention of development of energy resources through the acts of the Defendants. Plaintiff claims that such persons' employment and quality of life depend on development of the nation's energy resources and that the acts of the Defendants will have serious secondary impacts, such as increased unemployment, possible energy shortages and an increasing balance of trade deficit, which it suggests affects the public's individual rights including the right of economic choice. The parties have stipulated to the facts, and both parties now seek a summary judgment, declaring the rights of the parties.

The Plaintiff asks the Court to hold that the Secretaries of Interior and Agriculture by their actions have in fact withdrawn those lands from entry, without reporting the withdrawal to Congress as required by the 1976 Federal Land Policy and Management Act, 43 U.S.C. §§ 1702(j), 1714(c), and to order them either to report the withdrawal to Congress, or to cease withholding the lands from leasing. The Defendants, admitting that the applications for leases have been filed with the Bureau of Land Management of the Interior Department and referred to the Forest Service of the Agriculture Department for its recommendations, assert that the latter has been making an administrative evaluation of those land areas for possible inclusion in the wilderness system and therefore have not acted in order to preserve the status quo of the lands. They admit that they have "proceeded slowly", but urge that such matters are committed to their uncontrolled administrative discretion.

The principal issue before the Court is whether or not the intent of Congress with respect to public lands has been threatened by an unauthorized de facto withdrawal from entry of these lands.

The Western Overthrust Belt is a geological formation extending from Alaska into Mexico and which crosses the states of Montana, Idaho, and Wyoming in which the lands in question are located. It is an active area of new onshore oil and gas exploration and production which has attracted considerable attention and interest from the oil and gas industry because of its geological favorability for the generation and entrapment of oil and gas.

Estimates of the potential of the Idaho–Wyoming–Utah portion of the Overthrust Belt for undiscovered recoverable oil and gas resources have been as high as 15 billion barrels of oil and 75 trillion cubic feet of natural gas. Estimates of the potential of the northern extension of the Overthrust Belt through western Montana for undiscovered recoverable oil and gas resources have been as high as 10 billion barrels of oil and 100 trillion cubic feet of natural gas.

The two specific areas within the Overthrust Belt of concern to this lawsuit are areas of 247,090 acres and 758,479 acres contained within RARE II Area No. 4–613 and RARE II Area No. 1–485 respectively. The Rocky Mountain Oil and Gas Association (RMOGA) has estimated that RARE II Area No. 4–613 has the potential of producing as much as 155 million barrels of oil and 1,759 billion cubic feet of natural gas and that RARE II Area No. 1–485 has the potential of producing as much as 54 million barrels of oil and 4,650 billion cubic feet of natural gas. Although there has been no exploratory drilling in RARE II Area No. 1–485 or in the relevant portion of RARE II Area No. 4–613 which would tend to either confirm or to refute any estimates as to potential oil and gas production in the areas, the interest of oil and gas producers in the areas in question, including the members of the Plaintiff organization, is readily apparent.

Because the Secretary of Interior's failure to act on oil and gas lease applications within the above areas is to a large degree a result of the Roadless Area Review and Evaluation (RARE) program conducted by the United States Forest Service, it will be helpful to review the history of the RARE programs. RARE I was initiated administratively in 1971 at the direction of Edward P. Cliff, Chief of the Forest Service, for the purpose of identifying those roadless and undeveloped areas within the National Forest System which should be further evaluated for addition to the National Wilderness Preservation System established by § 2(a) of the Wilderness Act of 1964, 16 U.S.C. § 1131(a) (1976), as well as those areas which should continue to be managed for their other resource values pursuant to the Multiple Use–Sustained Yield Act of 1960, 16 U.S.C. §§ 528–531 (1976).

RARE I resulted in an inventory of approximately 56 million acres of National Forest System lands in 1,449 separately identified areas to determine which lands were roadless and undeveloped and 5,000 acres or more in size or otherwise eligible for consideration as wilderness because of their proximity to existing wilderness or primitive areas. In October 1973 the Chief of the Forest Service selected two hundred seventy–four (274) areas totalling 12.3 million acres as lands which were to receive intensive wilderness study to determine whether they should be recommended to Congress for inclusion in the National Wilderness Preservation System. Completion of the RARE I program was never accomplished for reasons unrelated to the issues before us.

In 1977 Assistant Secretary of Agriculture Rupert Cutler initiated the RARE II program with purposes similar to those of the RARE I program. The Secretary of Agriculture claims the present RARE II study to be "part of the broad planning direction for all Forest Service activities laid out by Congress in the Forest and Rangeland Renewable Resources Planning Act of 1976 and the National Forest Management Act of 1976." Final Environmental Impact Statement, RARE II, Jan. 1979, p. iii. The RARE II program differed most significantly from the RARE I program in that RARE II resulted in immediate wilderness recommendations whereas RARE I resulted simply in the selection of areas to be studied further for possible wilderness classification. All RARE II lands were allocated to one of three categories:

(1) Areas to be recommended for wilderness designation by Congress (wilderness);

(2) Areas to be used for purposes other than wilderness (non–wilderness); or

(3) Areas to be studied further to determine their wilderness or non–wilderness suitability (further planning).

In the RARE II Final Environmental Statement (FES) issued on January 4, 1979, the list of RARE II inventory lands contained 2,919 roadless areas encompassing more than 62 million acres.

Approximately 45 million acres of National Forest System lands included in the original RARE I inventory were also included in the RARE II inventory. On the basis of the RARE II FES, the Administration recommended to Congress that 631 invento-

ried roadless areas, totalling 15.5 million gross acres, be designated as components of the National Wilderness Preservation System; that 1965 inventoried roadless areas, totalling 36.7 million gross acres, be managed non–wilderness; and that 322 inventoried roadless areas, totalling 10.8 million gross acres, be studied further to determine their suitability for wilderness designation. On May 2, 1979 the Administration's recommendations were sent to Congress and the RARE II program was completed.

The importance of the Forest Service's RARE programs with relation to the Secretary of the Interior's failure to act on the oil and gas lease applications within the two areas in question is seen by an examination of the oil and gas leasing practices of the Secretary of the Interior. Under the Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq. the Secretary of the Interior is given the authority to lease all public lands which are known or believed to contain oil and gas deposits. 30 U.S.C. § 226(a). The statute gives to the Secretary of the Interior broad power to issue oil and gas leases on public lands within known structures of producing oil and gas fields, *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), and to accept or reject oil and gas lease offers. *McTiernan v. Franklin*, 508 F.2d 885 (10th Cir. 1975).

On April 13, 1945, the Assistant Secretary of Agriculture, Charles F. Brannan, sent a letter to the Secretary of Interior requesting the Department of Interior to appraise the Department of Agriculture of all pending applications, entries, filings, withdrawals, and so forth under the Federal Mineral Leasing Act, which if granted or approved would affect the status or the subsequent use and occupancy of the National Forest lands, and to allow the Department of Agriculture to determine and advise the Secretary of Interior as to the public interest if the described lands are subjected to the proposed oil and gas lease or as to the special stipulations required to safeguard public interest and property. (Exhibit 15 to Stipulation of Facts).

Oscar L. Chapman, Assistant Secretary of Agriculture, responded to Assistant Secretary Brannan through a letter dated May 21, 1945 agreeing that the Forest Service should have an opportunity to suggest adjustments to proposed leases before any mineral leases are issued for lands in National Forest Lands and stating that the Commissioner of the General Land Office had been instructed to inform the Forest Service promptly upon the filing of any lease application for National Forest Lands. (Exhibit 15 to Stipulation of Facts).

From that correspondence has developed the policy of the Department of the Interior to request the Forest Service to make recommendations on all oil and gas lease applications involving public National Forest System lands, and not to act on any non-competitive, open oil and gas lease applications involving public domain National Forest System lands without having received a recommendation from the Forest Service. Thus, when a noncompetitive, open land, oil and gas lease application is received by the Idaho, Wyoming, or Montana State Office of the Bureau of Land Management covering surface lands managed by the Forest Service, the Forest Service Regional Office or Forest Supervisor's Office are sent a copy of the application and a request that the Forest Service make a recommendation on the application. (Stipulation of Facts, Nos. 69, 71, 76, 78, and 79).

The practice of the Forest Service has been to recommend either issuance of the oil and gas lease on which recommendation is sought, in whole or in part, without any restrictions; or that the lease be issued in whole or in part, with certain stipulations attached; or that the lease application be rejected in whole or in part. (Stipulation of Facts, Nos. 69 and 71). The recommendations of the Forest Service are always followed by the BLM with respect to the issuance of oil and gas leases, although the terms recommended by the Forest Service have been modified on occasion by the Secretary of the Interior following an administrative appeal by an applicant. (Stipulation of Facts, Nos. 77 and 84).

The Bureau of Land Management state offices in Idaho, Wyoming, and Montana do not make independent assessments of the surface values of public lands prior to acting on oil and gas lease applications, nor do they make independent assessments of whether or not the issuance of an oil and gas lease, with or without the proposed Forest Service stipulations, would adversely affect surface values. Rather, it is the policy of the Department of the Interior and the Idaho, Wyoming, and Montana state offices of the BLM to follow Forest Service recommendations on all oil and gas lease applications involving National Forest System lands unless reason is shown for doing otherwise. (Stipulation of Facts, No. 84).

The general policies of the Department of Agriculture with respect to oil and gas leasing in RARE II inventory areas have been based on the intention of the Department that RARE II inventory areas be managed to protect their wilderness potential throughout the RARE II evaluation process. (Stipulation of Facts, No. 32 and Exhibits 2 through 6 and 8 thereto). The present general policy of the Forest Service is to prescribe stipulations to protect the wilderness characteristics of leased lands consistent with their use for the purposes for which the land is leased. (Stipulation of Facts, Exhibit 7). Thus, the Forest Service will normally recommend or consent to issuance of leases where operations can be conducted by methods not requiring surface disturbance and other impacts. (Stipulation of Facts, Exhibit 7). The stated policy if surface disturbance would be required is to base the Chief's recommendation or decision on an evaluation of all environmental and land use values, alternatives for operations, and mineral values. Mineral exploration in areas designated as further–planning areas must be conducted in such a way that a wilderness option is retained or can be restored by reclamation. (Stipulation of Facts, Exhibit 7). The Forest Service has recommended certain stipulations be placed on oil and gas leases involving Forest System lands in RARE II inventory areas requiring Forest Service concurrence before development and production operations on oil and gas leases may proceed and before directional drilling would be permitted. (Stipulation of Facts, Nos. 35–39).

## I. RARE II AREAS NOS. 4–613 AND 1–485

RARE II Area No. 4–613 is an area covering 247,090 acres of land in the Targhee National Forest in Idaho and Wyoming and the Bridger–Teton National Forest in Wyoming, in Region 4 of the Forest Service, and is located within what is generally described as the Idaho–Wyoming portion of the Overthrust Belt. RARE II Area No. 4–613 includes a 129,510 acre area which was RARE I Candidate Study Area No. 336. On May 2, 1979, the Administration recommended that RARE II Area No. 4–613 be allocated to further planning. The practice of Region 4 of the Forest Service has been to recommend against the issuance of oil and gas leases in those portions of RARE II areas within its jurisdiction which have been RARE I Candidate Study Areas, and thus the Forest Service has recommended against the issuance of oil and gas leases in that portion of RARE II Area No. 4–613 which was RARE I Candidate Study Area No. 336. It has been the practice of Region 4 of the Forest Service to recommend that any oil and gas leases issued in those RARE II inventoried roadless areas which did not include former RARE I Candidate Study Areas be issued with a stipulation which does not permit any use of the surface by the oil and gas lessee without Forest Service permission. Since November 1979 no instances have been brought to the attention of the Court where the Forest Service has made favorable recommendations on any oil and gas lease applications in RARE II Area No. 4–613. (Stipulation of Facts, Nos. 52 and 55).

RARE II Area No. 1–485 covers 758,479 acres of the Montana portion of the Overthrust Belt and is under the jurisdiction of Region 1 of the Forest Service. The practice of Region 1 of the Forest Service also has been to refrain from making recommendations to the Bureau of Land Management on any oil and gas lease applications

involving RARE II Area No. 1–485, other than a recommendation not to take any action on the applications. (Stipulation of Facts, No. 64). Thus, the Forest Service's actions in regard to both RARE II Areas in question have been taken to preserve the wilderness characteristics of the RARE II inventory areas. (Stipulation of Facts, Nos. 56 and 65).

It is clear, as Plaintiff alleges, that with only one exception no oil and gas leasing is taking place on the National Forest System lands which are the subject of this action. It cannot be seriously contended by the Defendants that RARE II Area No. 4–613 and RARE II Area No. 1–485 have not been virtually totally withdrawn from oil and gas leasing since at least the mid–1970's. As of November 18, 1977, 85 total applications for oil and gas leases involving lands in RARE II Area No. 4–613 were awaiting final action. (Stipulation of Facts, No. 88). As of the first of this year, and to our knowledge as of the present, 82 of the 85 were still awaiting final action. (Stipulation of Facts, No. 59). The three oil and gas leases issued since November 18, 1977 within RARE II Area 4–613 have all been outside the portion of the area which en-compasses former RARE I Candidate Study Area No. 336, and no oil and gas leases have been issued in the Wyoming portion of RARE II Area No. 4–613. (Stipulation of Facts, Nos. 92 and 93). As of November 18, 1977, 313 noncompetitive, open land, applications for oil and gas leases were awaiting final action in RARE II Area No. 1–485. (Stipulation of Facts, No. 95). At least 39 applications for oil and gas leases have been filed in RARE II Area No. 1–485 since that date and as of the first of this year, and to our knowledge as of the present, no oil and gas leases have been issued in RARE II Area No. 1–485 since November 18, 1977. (Stipulation of Facts, Nos. 96 and 97).

The preservation of the wilderness characteristics of the lands in question has been the policy behind the failure of the Secretary of the Interior to act on over 425 applications outstanding in the two areas. Once the initial decision by the Department of the Interior is made with respect to whether the lands are available for leasing, the true decision–making power with respect to the issuance of oil and gas leases on National Forest System lands is, as Plaintiff alleges, in the Department of Agriculture.

The Bureau of Land Management, both on a national and a state level, has been aware of the policies and practices of the Forest Service with respect to oil and gas leasing in RARE I and RARE II inventory areas, and it has in the past relied and presently continues to rely on the recommendations of the Forest Service with respect to the issuance of oil and gas leases in these areas. (Stipulation of Facts, Nos. 82–86). The Forest Service in turn has relied on the BLM's policy and practice of following Forest Service recommendations on oil and gas leases to implement the RARE II program. (Stipulation of Facts, No. 87).

## II.  PLAINTIFF'S CONTENTIONS

The Plaintiff herein asserts that the Secretary of the Interior's failure to act on the oil and gas lease applications constitutes (1) a withdrawal of the lands from the operation of the Mineral Leasing Act of 1920, without submitting such withdrawal to Congress for approval as required by the Federal Land Policy Management Act, and (2) a rule or regulation of either or both of the Departments of Interior and Agriculture which was not promulgated as required by the Administrative Procedure Act, 5 U.S.C. § 553(a). One of the Plaintiff's original grounds for relief was the allegation that the failure to act constitutes a management decision implemented without submission to Congress for approval as required by 43 U.S.C. § 1712(e)(2). The Plaintiff, at oral argument on its motion for summary judgment, failed to assert such a position and appears to have withdrawn that claim in its memorandum in opposition to the Defendants' motion for summary judgment. (See Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, Pg. 16).

A. *Withdrawal from Operation of the Mineral Leasing Act of 1920.*

The Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1702(j), defines "withdrawal" as the "withholding in the area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program...". 43 U.S.C. § 1714(c)(1) of that Act specifies that before the date upon which public lands are withdrawn for the purpose of limiting activities in the area or for some other public purpose, the Secretary of the Interior must notify both Houses of Congress of such withdrawal and the Houses of Congress be given the opportunity to terminate the withdrawal by adoption of a concurrent resolution stating that Congress does not approve the withdrawal. The Defendants admit that they have not notified Congress that the lands in question herein have been withdrawn as required by the statutes cited above, but the Defendants assert that the actions of the Secretary of the Interior do not constitute a withdrawal under the terms of 43 U.S.C. § 1702(j).

■ Yet, the combined actions of the Department of the Interior and the Department of Agriculture fit squarely within the foregoing definition of withdrawal found in 43 U.S.C. § 1702(j). The combined actions of the Secretaries have (1) effectively removed large areas of federal land from oil and gas leasing and the operation of the Mineral Leasing Act of 1920, (2) in order to maintain other public values in the area, namely those of wilderness preservation. That's the plain meaning of Congress' definition of "withdrawal".

That the decision to withhold all oil and gas leasing in large areas of federal land falls within the terms of the statute is also supported by various sections of the Federal Land Policy and Management Act. Congress, in 43 U.S.C. § 1701 stating the policy of the Federal Land Policy and Management Act, declared that it is the policy behind the Act that, among other things, Congress should exercise its constitutional authority to withdraw or otherwise designate or dedicate federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action. Congress further declared that it was a purpose of the United States that the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals from the public lands including the implementation of the Mining and Mineral Policy Act of 1970, 30 U.S.C. § 21a.

43 U.S.C. § 1714(c)(2) requires that any notice of withdrawal to Congress must be accompanied by a clear explanation of the proposed use of the land involved which led to the withdrawal, an inventory and evaluation of the current natural resource uses and values of the site and adjacent public and nonpublic land and how it appears they will be affected by the proposed use, and a report prepared by a qualified mining engineer, engineering geologist, or geologist which shall include but not be limited to information on: general geology, known mineral production, mining claims, mineral leases, evaluation of future mineral potential, present and potential market demand. It is clear that Congress intended that it be made aware of and have the opportunity to oversee the withdrawal of public lands from mineral use, and that it should be informed as to the natural resource potential of lands withdrawn from use by the Secretary of the Interior.

■ The Plaintiff argues that the withholding of National Forest System lands from oil and gas leasing to preserve their wilderness characteristics is necessarily a withdrawal of the lands from the operation of the Mineral Leasing Act of 1920, because the Secretary of Interior lacks the authority under that act to close large tracts of land to oil and gas leasing for such purposes. We have found no case law directly addressing the extent of the Secretary of the Interior's power to withhold lands for leasing based on environmental concerns. The Mineral Leasing Act of 1920 has been con-

sistently construed as leaving to the Secretary's discretion the determination as to what lands are to be leased thereunder. *Pease v. Udall*, 332 F.2d 62 (9th Cir. 1964). *Burglin v. Morton*, 527 F.2d 486 (9th Cir. 1976). The Secretary has the discretion to refuse to issue any lease at all on a given tract. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). There are, nonetheless, limits on how the Secretary may exercise his discretion under the Act. See *Winkler v. Andrus*, 594 F.2d 775 (10th Cir. 1979) and *Seaton v. Texas Company*, 256 F.2d 718 (D.C. Cir. 1958). The Interior Board of Land Appeals has suggested that one of these limitations is that in considering whether lease offerings have been properly acted upon by the Secretary, a court must differentiate between an exercise of discretion that has general applicability and one pertaining to an individual lease. *Esdras K. Hartley*, 23 IBLA 102 (1975). Such a limitation is consistent with a reading of the Mineral Leasing Act and the legislative history of the Act.

■ We doubt that it can be said that the legislative history of the Mineral Leasing Act of 1920 indicates that Congress intended for the Secretary of the Interior to have the ability to effectively withdraw large areas of land from mineral exploration and development based solely on the desire for wilderness preservation and without consideration of the mineral potential in the area. The stated purpose of the Mineral Leasing Act was to allow the Secretary of the Interior to regulate oil and gas, to prevent monopoly and waste, and to protect the interest of the public in retaining some of the oil reserves for the use of the government. In House debate on the bill, a report by the then Director of the Bureau of Mines, Dr. Van H. Manning, was quoted on the floor of the House. The statement of the Director is as applicable today as it was in 1919:

"Faced with this growing need for petroleum, we have to consider seriously the means whereby an adequate supply for the future can be obtained. We know that the domestic output does not meet the present consumption, and that the amount of this deficit will probably continue to increase ... A diminishing output, with increased consumption, will make the United States more dependent upon foreign oil fields." 58 Cong.Rec. 7510 (1919).

■ The Mineral Leasing Act was intended to promote wise development of natural resources and to obtain for the public reasonable financial returns on assets belonging to the public. *California Co. v. Udall*, 296 F.2d 384 (D.C.1961). The Secretary of the Interior must administer the Mineral Leasing Act so as to provide some incentive for, and to promote the development of oil and gas deposits in all publicly-owned lands of the United States through private enterprise. *Harvey v. Udall*, 384 F.2d 883 (10th Cir. 1967). To withhold vast tracts of land from oil and gas leasing for the purpose of wilderness preservation is, to withdraw and withhold the lands from the purposes and operation of the Mineral Leasing Act. If Congress had intended that result when it passed the sweeping Federal Land Policy and Management Act in 1976, which was the product of the Land Law Review Commission's extensive studies of the entire area of public land law, we feel Congress would have said so, and it didn't.

Similarly, subsequent public land bills supplementing the Mineral Leasing Act support the proposition that the focus of that Act was mineral development despite the primitive nature of much of the public lands. Congress declared its purpose in the Mines and Mineral Policy Act of 1970 in these words:

"The Congress declares that it is the continuing policy of the federal government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs, . . .

It shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising his authority under such programs as may be authorized by law other than this Act." 30 U.S.C. § 21a (1976).

Section 4(d) of the Wilderness Act of 1964 directs that mineral exploration and development be permitted even in congressionally designated wilderness areas. It states that,

"until midnight December 31, 1983, the United States mining laws and all laws pertaining to mineral leasing shall to the same extent as applicable prior to the effective date of the Act . . ., extend to those national forest lands designated by this Act as 'wilderness areas'; subject, however, to such reasonable regulations governing ingress and egress as may be prescribed by the Secretary of Agriculture *consistent with the use of the land for mineral location and development and exploration, drilling, and production, and use of the lands for . . . facilities necessary in exploring, drilling, producing, mining and processing operations,* including where essential, the use of mechanized ground or air equipment and restoration as near as practicable of the surface of the land disturbed in performing prospecting, location, and in oil and gas leasing, discovery work, exploration, drilling, and production as soon as they have served their purpose... Mineral leases . . . covering lands within national forest wilderness areas designated by the Act shall contain such reasonable stipulations as may be prescribed by the Secretary of Agriculture for the protection of the wilderness character of the land consistent with the use of the land for the purposes for which they are leased, permitted, or licensed." 16 U.S.C. § 1133(d)(3). (Emphasis supplied).

The legislative history of the Wilderness Act of 1964 also shows that mineral development has always been a primary concern of Congress, even in designated wilderness areas. In discussing the provision before the Senate debate on the conference report on the bill, Senator Allot remarked:

"I am also happy that the present bill incorporates features of multiple use that the other bill (S.4) did not contemplate. I believe this will give a reasonable opportunity in the future to do two things. First of all, it will make it possible to accurately appraise the land that is now suitable for inclusion into the wilderness area, and allow Congress the opportunity to put it in the system and give Congress time to study it. Secondly, it will give impetus to the opportunity for natural resources development, particularly in the West, where nearly all of the proposed wilderness areas are located, to which the Western States are justly entitled." 110 Cong.Rec. 20603 (1964).

In 1973 bills were introduced in both Houses of Congress proposing to amend the Wilderness Act by striking the language allowing mineral prospecting and exploration in national forest wilderness areas and by changing the mineral entry and leasing deadline from December 31, 1983 to the day of the proposed amendment's enactment. The Senate bill would have withdrawn all wilderness system lands, including those to be added in the future from the mining and mineral leasing laws. The Senate bill did not go further than the Senate Committee on Interior and Insular Affairs. The Committee recognized that it was the original intent of Congress to insure mineral evaluation before withdrawal of lands from mining and mineral leasing laws and that it would be in the national interest to keep wilderness lands open to these laws.

There is thus little doubt as to Congress' desire to keep lands already designated as wilderness areas open to oil and gas leasing until at least December 31, 1983. It would surely be inconsistent with that intent to conclude that although lands in designated and approved wilderness areas are subject to oil and gas leasing until December 31, 1983, that lands merely under administrative study for a proposed wilderness area may be effectively withdrawn from leasing without the consent of Congress.

■ Congress unambiguously established by the enactment of the Wilderness Act that Congress had the authority to create wilderness areas and to close primitive areas to oil and gas leasing. 16 U.S.C. § 1132. To allow the Secretary of Agriculture, in combination with the Secretary of Interior, to establish their own system of wilderness priorities through failure to act on oil and gas lease applications within lands self–designated as meriting study for wilderness potential negates the system of wilderness designation established by Congress.

The Department of Interior itself has recognized the limiting effect of Congressional acts dealing with land management on the discretion of the Secretary under mining and mineral leasing laws already in existence. (See letter from Secretary of Interior Morton to Spiro Agnew reprinted in the Legislative History of FLPMA, at 1174, and found at S.Rep. No. 92–1163, 92nd Cong., 2d Sess. 23 (1972)).

■ Plaintiff also urges that the Secretary of Interior has no authority to delegate his discretion under the Mineral Leasing Act to the Secretary of Agriculture. We find it unnecessary to address this issue but note that the Secretary of Agriculture's express authority to manage lands within the national forests also appears limited by the Congressional emphasis on mineral development. The first source of express authority given the Secretary of Agriculture from which implied authority as to oil and gas leasing may be inferred is the Organic Administration Act of June 4, 1897, 16 U.S.C. § 551, et seq. The clear intent of Congress in the enactment of the Organic Administration Act was that national forest lands remain open to mineral exploration and development. The act provided for the exclusion from national forest lands of any lands determined to be better adapted for mining purposes than for forest usage and that any mineral lands subject to entry under existing mining laws would continue to be so under the Organic Administration Act. See 16 U.S.C. § 482 (1976).

Subsequent acts defining the Forest Service's authority to manage national forest lands reiterate that surface management was not to interfere with mineral development on those lands. The Multiple Use–Sustained Yield Act of 1960 included such language within the body of the Act. See 16 U.S.C. § 528 (1976). The Forest and Rangeland Renewable Resources Planning Act of 1974 and the National Forest Management Act continued in effect the priorities established by Congress in the earlier acts. See 16 U.S.C. §§ 1600–1614 (1976) and 16 U.S.C. § 1600 et seq. (1976). In all aspects, the programs were meant to conform to the requirements of existing law, S.Rep. No. 686, 93rd Cong., 2nd Sess. 8 (1976), which would include the requirement of 16 U.S.C. § 528 that nothing be construed so as to affect the use or administration of mineral resources of national forest lands.

In short, a review of all legislation dealing with use of public lands shows the serious concern of Congress over mineral development. The disposition of minerals in lands owned by the United States is by express "constitutional grant", the responsibility of Congress. Honchok v. Hardin, 326 F.Supp. 988, (Maryland 1971), United States v. Midwest Oil Company, 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1914). It was the very intent of Congress that public lands be available for the purpose of encouraging discovery of minerals, U. S. v. Coleman, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968), and it is still the policy of the land laws of the United States today that except as otherwise provided, all valuable mineral deposits in lands belonging to the United States shall be open to exploration under regulations prescribed by law. Ranchers Exploration & Development Co. v. Anaconda Co., 248 F.Supp. 708 (Utah 1975).

■ That policy is limited by the ability of Congress to grant and withdraw rights to locate mining claims on public lands. Any such withdrawal may be accomplished in the manner that Congress deems appropriate. Lutzenhiser v. Udall, 432 F.2d 328 (9th Cir. 1970). In those cases where congressional power to withdraw land from mineral entry is delegated to the

executive branch, Congress may prescribe the method by which the delgated authority shall be exercised. *Lutzenhiser v. Udall, supra.* However, it is clear that Congress intended with the passage of FLPMA to reassert control over the use of federal lands. We cannot believe Congress did not expect that its express withdrawal requirement in FLPMA to extend to a situation where the Departments of Interior and Agriculture have instituted a policy effectively precluding the exploration of minerals on large areas of National Forest lands in order to preserve potential wilderness uses on the land. One only need consider the comments of Representative Skubitz made during congressional discussion of FLPMA to realize that this situation is well within the intended scope of FLPMA and the purposes that Congress had in mind with passage of the Act.

"At present, almost two–thirds of all public lands have been withdrawn for single–purpose use, primarily the preservation of wilderness.

It seems inconsistent for some to decry our country's increasing energy dependence on foreign imports, and yet, at the same time to continue restricting the development of more and more of our Federal lands.

Why for example, do we continue to so severely restrict the discovery and mining of valuable minerals or energy resources available to us within the United States?" *Reprinted in Legislative History of FLPMA at pg. 670.*

■ We conclude that it was the intent of Congress with the passage of FLPMA to limit the ability of the Secretary of the Interior to remove large tracts of public land from the operation of the public land laws by generalized use of his discretion authorized under such laws.

*B. Failure to Promulgate Rules and Regulations.*

Plaintiff further contends that the Defendants' failure to promulgate rules and regulations setting forth the bases upon which oil and gas lease applications can be approved, rejected, or suspended, and setting forth principles of coordination between the Departments of Agriculture and Interior with respect to oil and gas leasing on National Forest System lands violates Section 310 of FLPMA. Section 102(a)(5) of FLPMA, 43 U.S.C. § 1701(a)(5), states that:

"The Congress declares that it is the policy of the United States that . . . (5) in administering public lands statutes and exercising discretionary authority granted by them the Secretary be required to establish comprehensive rules and regulations after considering the views of the general public; and to structure adjudication procedures to insure adequate third party participation, objective administrative review of initial decisions, and expeditious decisionmaking." 43 U.S.C. § 1701(a)(5).

The stated Congressional policy was implemented through 43 U.S.C. § 1740:

"The Secretary, with respect to the public lands, shall promulgate rules and regulations to carry out the purposes of this and other laws applicable to the public lands, and the Secretary of Agriculture, with respect to lands within the National Forest System, shall promulgate rules and regulations to carry out the purposes of this Act. The promulgation of such rules and regulations shall be governed by the provisions of chapter 5 of title 5 of the United States Code, without regard to section 553(a)(2) . . . 43 U.S.C. § 1740 (1976)."

■ The language of Congress is mandatory. Congress required the discretionary authority of the Secretaries of Interior and Agriculture with respect to public lands to be exercised through rules and regulations. Yet there presently exist no such comprehensive rules and regulations regarding the approval, rejection, or failure to act upon oil and gas lease applications. Such rules are mandated and are a necessity if Congress is going to oversee the policies and procedures set forth by FLPMA.

■ The reasons for requiring the Secretaries to enact rules and regulations in this respect, as mandated by FLPMA, can be seen by the complications surrounding this case. The confusion as to who exercises the real authority and discretion with respect to public lands and on what basis such discretion and authority are exercised could, to a large degree, have been avoided had the Secretaries enacted rules and regulations governing their policies in these regards. It would be impossible for Congress to monitor the Secretaries' actions with respect to public lands and to implement its expressed desire to "exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and to delineate the extent to which the Executive may withdraw lands without legislative action," (43 U.S.C. § 1701(a)(4), without Congressional knowledge of the policies of the Secretaries with respect to their actions and inactions as to public lands. Yet, in the absence of published rules and regulations, this policy exists only in their 1945 correspondence.

■ The Defendants assert that the Plaintiff has failed to state a claim upon which relief can be granted. For the Court to exercise jurisdiction over the action brought by Plaintiff, the Plaintiff must assert a "case or controversy" against the Defendants. *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937), *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Although no precise definition of the words case and controversy can be fashioned for every case, *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), it has been said that, basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant judicial relief. *Golden v. Zwickler*, supra. The Court must determine whether the duty asserted can be judicially determined, and whether protection for the right asserted can be judicially molded. *Powell v. McCor-*

*mack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

■ It is the Defendants' contention that because the Mineral Leasing Act of 1920 provides no circumstances under which the Secretary of Interior is required to issue oil and gas leases and since the filing of an application does not give an applicant a legal right which reduces or restricts the discretion vested in the Secretary, that the Plaintiff has suffered no injury to a legally protected right. The Secretaries have confused lack of an established property interest with lack of standing to question the procedures by which the Secretary of Interior has prevented perfection of such an interest. Although an applicant acquires no vested interest by merely filing his application, he does have the right to avail himself of the application route in an effort to perfect an interest to the extent not precluded by some valid exercise of the agency's discretion. *Krueger v. Morton*, 539 F.2d 235 (D.C.1976). At some point administrative delay amounts to a refusal to act, with sufficient finality and ripeness to permit judicial review. *Foti v. Immigration and Naturalization Service*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963), *Cities Services Gas Co. v. F.P.C.*, 255 F.2d 860 (10th Cir. 1958), *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093 (D.C.1970). When administrative inaction has precisely the same effect on the rights of the parties as denial of the requested agency action, an agency may not prevent judicial review by masking agency policy in the form of inaction rather than an order denying the action requested. *Environmental Defense Fund, Inc. v. Hardin*, supra, *International Association of Machinists and Aerospace Workers, AFL–CIO v. National Mediation Board*, 425 F.2d 527 (D.C.1970). The Administrative Procedure Act requires every agency to conclude any matter presented to it within a reasonable time, and provides that the reviewing court shall compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. §§ 555(b) and 706. It is the right of the applicant to have the government agency follow proper proce-

dures in the exercise of its discretion. *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975), *Pennsylvania v. Morton*, 381 F.Supp. 293 (D.C.1974). It is sufficient for the Plaintiff to allege a procedural injury. *Calvert Cliffs Coordinating Committee, Inc. v. United States Atomic Energy Commission*, 449 F.2d 1109 (D.C. Cir. 1971), *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *Udall v. F.P.C.*, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967).

██ The case before us is a "case and controversy" within the legal meaning of those words. The facts before us show that there is a substantial controversy between parties having adverse legal interests, and the Defendants have admitted in their brief that if they have unlawfully withdrawn lands as defined by FLPMA that the Court may provide a remedy by declaring the invalidity of the withdrawal. The relief requested by the Plaintiff may be worded in specific enough terms and in sufficient detail so as to put Defendants on notice of what they are called upon to do. *Williams v. United States*, 402 F.2d 47 (10th Cir. 1976).

██ Defendants argue that because there has been no administrative order purporting to close the lands in question to leasing and because there has been no action taken by the Secretary of Interior on the lease applications at all, the actions of the Secretary of Interior cannot be said to amount to a withdrawal of the lands from oil and gas leasing. This contention has been largely met above. To accept such an argument would be to ignore the realities of the present situation. The Secretary of the Interior's discretionary authority is reviewable by the Court. *McTiernan v. Franklin*, 508 F.2d 885 (10th Cir. 1975), *Kreuger v. Morton*, supra.

We cannot allow the Defendants to accomplish by inaction what they could not do by formal administrative order. By our decision herein, we do not purport to rere-quire the Secretary of the Interior to accept, reject, or even take action on the outstanding oil and gas leases. We merely hold that the action taken by the Secretary of the Interior, in concert with the Secretary of Agriculture, in failing to act on the outstanding lease applications falls within the definition of withdrawal under 43 U.S.C. § 1702(j) and the Secretary of the Interior is required to notify Congress of such withdrawal or institute action on the applications.

NOW, THEREFORE, IT IS HEREBY

ORDERED that the Plaintiff's motion for summary judgment be, and the same hereby is granted; it is further

ORDERED that the Secretary of the Interior shall report the withdrawal of the above–described lands to Congress within twenty (20) days of the entry of this Order, pursuant to 43 U.S.C. § 1714(c), or cease withholding said lands from oil and gas leasing, exploration, and development for the purpose of preserving the wilderness characteristics of the lands; it is further

ORDERED that the Defendants shall each promulgate rules and regulations, according to the rulemaking procedures of the Administrative Procedures Act, governing the standard policies of the Department of the Interior and the Department of Agriculture relating to the bases on which oil and gas applications may be rejected, approved, or suspended and which relate to the principles on which the cooperation between the Departments of Interior and Agriculture, with respect to such leasing activity, is based; it is further

ORDERED that the Defendants' motion for summary judgment be, and the same hereby is, denied.