MARATHON OIL COMPANY, Plaintiff,

v.

UNITED STATES of America; United States Department of the Interior, Donald Hodel, Secretary of the Interior; Esther Wunnicke, Commissioner of The Department of Natural Resources, State of Alaska; Cook Inlet Region, Inc., an Alaska Corporation, Defendants.

COOK INLET REGION, INC., an Alaska Corporation, Counterclaimant,

v.

MARATHON OIL COMPANY, an Ohio Corp., Counterdefendant.

Civ. No. A 83–208.

United States District Court, D. Alaska.

Feb. 20, 1985.

Robert L. Richmond, Richmond & Associates, Anchorage, Alaska, Robert J. Kapelke, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for plaintiff Marathon Oil.

Michael Spaan, U.S. Atty., Anchorage, Alaska, Peter Schaumberg, U.S. Dept. of the Interior, Michael W. Reed, U.S. Dept. of Justice, Washington, D.C., for federal defendants.

Steve C. Hillard, Munger, Tolles & Rickershauser, Anchorage, Alaska, William D. Temko, Munger, Tolles & Rickershauser, Los Angeles, Cal., for defendant Cook Inlet Region, Inc.

Mark P. Worcester, Asst. Atty. Gen., Dept. of Law, Anchorage, Alaska, for defendant State of Alaska.

JAMES M. FITZGERALD, Chief Judge.

Plaintiff Marathon Oil Company owns an undivided fifty percent working interest in certain oil and gas leases in the Kenai Field Unit in Alaska. Marathon and its working interest associate, Union Oil Company of California, discovered natural gas in the Kenai field in 1959, and production commenced in 1961.

During 1982, a representative year, the production of the Kenai field was delivered to a number of different purchasers. Approximately 16% was delivered to a liquefied natural gas (LNG) plant at Nikisi, Alaska owned by Marathon and Phillips Petroleum Company. Over 42% of Kenai field gas was delivered to an ammonia and urea plant at Mikisi owned by Collier Chemical Company, a subsidiary of Union Oil Company. Over 31% of production was sold to Alaska Pipeline Company under a long-term contract for distribution in the Anchorage market. About 9% of the gas was rented to the Swanson River Field Unit for pressure maintenance. A small portion of the gas was sold under contract to the City of Kenai, and a portion was used in production operations in the Kenai field.

Each of the defendants, the United States, the State of Alaska, and Cook Inlet Region, Inc. (CIRI), is entitled to receive royalties on gas produced in the Kenai field. There are both federal leases and state leases in the Kenai field. The leases are of four types: (a) leases which were originally federal leases covering lands later conveyed to the state pursuant to the Statehood Act;[1] (b) leases which were originally federal leases covering lands later conveyed to CIRI pursuant to the Alaska Native Claims Settlement Act (ANCSA);[2] (c) federal leases covering lands currently held by the United States; and (d) state leases covering lands currently held by the state. All of the federal leases provide that Marathon shall pay 12½% royalty on the reasonable value of production from the leased lands. Alaska does not directly receive royalties from production attributable to the federal leases. However, under a provision of the Mineral Lands Leasing Act,[3] Alaska is entitled to 90% of all royalties received by the United States from oil and gas production on federal lands in the Kenai field.

A dispute arose in 1977 between Marathon and the United States Geological Survey (USGS)[4] as to the proper method of computing the reasonable value, for royalty purposes, of that part of gas production from federal leases delivered to the LNG plant. Gas delivered to the plant is cooled through a multi-step cooling process to transform it into a liquid. The liquefied natural gas (LNG) is then transported by tanker to Japan where it is sold to two utility companies. Marathon had been computing royalties on this gas on the basis of the price paid for Kenai field gas under the long-term contract with Alaska Pipeline Company. In 1977 USGS took the position that royalty value was to be estab-

1. Pub.L. No. 85–508, 72 Stat. 339 (1958).

2. 43 U.S.C. §§ 1601–1628 (1982).

3. 30 U.S.C. § 191 (1982).

4. The responsibility for management of federal oil and gas leases is now held by the Minerals Management Service (MMS) of the Department of the Interior (DOI).

lished on the basis of the sales price for LNG in Japan less expenses.[5]

To resolve the dispute, Marathon and the USGS entered into an agreement on February 6, 1981, retroactive to January 1, 1980.[6] The settlement agreement provided that royalties were to be computed using the "Phillips formula" which had been developed for use by Phillips Petroleum Co. in computing royalties due the state of Alaska under state leases for gas delivered to the LNG plant at Nikisi. Under the Phillips formula, Marathon was to pay royalties based on 36% of the per MMbtu price received in Japan for the LNG (less certain adjustments). In addition, Marathon paid USGS $1,834,160.83 representing additional royalties due from January 1, 1980 through February 1981. The settlement agreement was, by its terms, effective "until such time as changes in market conditions, State or Federal law, or regulations adopted thereunder ... necessitate a revision in the method used to determine the wellhead value." [7]

On January 6, 1983, the Minerals Management Service (MMS) notified Marathon of MMS's intention to redetermine the reasonable value for computing royalties on gas delivered to the LNG plant.[8] The letter stated that the basic net back valuation theory by which the reasonable wellhead value was derived from the sales price in Japan was sound, but that adjustments were necessary to reflect changing costs and prices due to economic conditions. MMS proposed to update the coefficients in the Phillips formula to reflect current processing and transportation costs.

The letter also informed Marathon that MMS would hold a public hearing on the matter in Anchorage, and that Marathon had thirty days to file written comments, evidence, and legal argument. Moreover, Marathon would have an opportunity at the hearing to present its views to MMS. A public hearing was held in Anchorage on March 1, 1983, and at that time Marathon appeared and offered information on its own behalf.[9]

Based on the hearing, written comments, and other materials, MMS on July 8, 1983 issued an order to Marathon directing the company to begin paying royalties as of August 1, 1983 based on the revised computations.[10] Marathon did not comply but filed an appeal of the July 8 order. In substance, Marathon disputed MMS's authority to redetermine the royalty basis, claiming that by notifying Marathon of the intended change in computation, MMS had repudiated the settlement agreement based on the Phillips formula. Moreover, effective April 1, 1983, Marathon unilaterally rolled back the basis on which royalties on gas delivered to the LNG plant were computed to presettlement rates. That is, rather than following the formula of 36% of the price received in Japan, which had been in effect since January 1980, Marathon began to compute royalties based on the long-term contract price paid by Alaska Pipeline Company for Kenai field gas.

Under the July 8, 1983 order of MMS, Marathon was required for royalty purposes to compute the value for gas delivered to the LNG plant at $3.00/Mcf. By the terms of the settlement agreement based on sales of LNG in Japan, Marathon in the period immediately prior to April 1, 1983 computed the value of gas for royalty purposes at $1.71/Mcf. After that date, Marathon computed the value of gas at $.61/Mcf based on the contract price for Kenai field gas paid by Alaska Pipeline Company.

After MMS learned Marathon had unilaterally rolled back the price effective April

---

**5.** Letter of Oct. 31, 1977 from Rodney A. Smith, USGS, to John R. South, Marathon Oil Co., Administrative Record (A.R.) 100.

**6.** Letter of February 6, 1981 from James P. Murphy, Marathon Oil Co., to Barry A. Boudreau, USGS, A.R. 145.

**7.** *Id.* at 3.

**8.** Letter of Jan. 6, 1983 from Robert E. Boldt, MMS, to Al Mechler, Jr., Marathon Oil Co., A.R. 47.

**9.** *See* A.R. 39.

**10.** Letter of July 8, 1983 from William H. Feldmiller, MMS, to Curtis Dowden, Marathon Oil Co., A.R. 8.

1, 1983, the agency issued a second order, dated October 5, 1983, directing Marathon to compute the value of gas for royalty purposes under the settlement or Phillips' formula for the months of April through July 1983.[11] Once again, Marathon did not comply with the MMS order. Finally, on June 11, 1984, the Department of the Interior (DOI) issued a third order directing Marathon to comply with the previous orders of MMS.[12]

Marathon filed a complaint in this court on April 14, 1983 challenging the revised valuation method proposed by MMS. The original complaint has been amended to challenge the three DOI orders issued after the complaint was filed.[13] In its amended complaint, Marathon now seeks declaratory relief to resolve the actual controversy among the parties involving the proper method of determining the wellhead value of the natural gas for royalty purposes. Apart from that, Marathon seeks redress for breach of lease provisions, for an accounting, for restitution, and to secure Marathon's rights under the United States Constitution and the Alaska Constitution.

The federal government in answer to the amended complaint denies that Marathon is entitled to relief for any of its claims and seeks to have the claims dismissed. In a counterclaim, the federal government contends that effective August 1, 1983, Marathon was required to compute royalties on production delivered to the LNG plant in accordance with the MMS orders. Under those orders, the reasonable value of gas at the wellhead is deemed to be $3.00/Mcf, as opposed to the $.61/Mcf value used by Marathon since April 1983. Moreover, the government requests that Marathon be required to pay $717,705 as unpaid royalties on production for the period from April through July 1983 computed using the Phillips formula. Since Marathon has persist-

ently failed to comply with the applicable statutes, regulations, and terms of its leases, the government requests an order from this court cancelling the leases and requiring Marathon to account for all royalty payments due and for judgment in the proper amount.

On October 1, 1984, the federal government requested that a preliminary injunction issue in this case to compel Marathon to pay the royalties on production delivered to the LNG plant in accordance with the MMS orders. A conference was held on December 3, 1984 to expedite the case and a schedule was agreed to for the filing of motions addressing the merits. The federal government filed for summary judgment on December 17, 1984. The ruling on the government's application for a preliminary injunction was deferred until the motion for summary judgment was heard. I now grant summary judgment and direct that Marathon comply with the MMS orders.

THE CLAIMS

Marathon's amended complaint includes claims of contract impairment amounting to constitutional deprivation. Marathon argues that in the MMS letters of January 6, 1983 and February 28, 1983, the federal defendants gave clear indication of intention to breach and repudiate the terms of the settlement agreement and provisions within the federal leases. By so doing, Marathon claims, the federal defendants violated Marathon's constitutional rights, suggesting that only in federal court could Marathon obtain vindication of its constitutional rights. Alternatively, Marathon contended that the Administrative Procedure Act provided for immediate judicial review of the MMS orders.[14]

■ So far as Marathon's contract and constitutional claims are concerned, I conclude they are entirely without merit. Under the statutes and regulations providing for the administration of federal oil lease,

---

**11.** Letter of Oct. 5, 1983 from Milton K. Dial, MMS, to D.J. Durham, Union Oil Co. (as agent for Marathon Oil Co.), A.R. 9.

**12.** Letter of June 11, 1984 from Assistant Secretary for Land and Minerals Management, Department of the Interior, to William F. Swales,

Marathon Oil Co., and Ray A. Burke, Union Oil of California, A.R. 11.

**13.** Marathon amended its complaint on October 7, 1983, and again on September 4, 1984.

**14.** 5 U.S.C. § 704 (1982).

MMS has the authority and the responsibility to determine the reasonable value of gas production for the purpose of computing royalties. The settlement agreement of February 6, 1981 can in no way restrict the proper exercise of the agencies' statutory authority. Moreover, I conclude no constitutional impairment of contract or other constitutional deprivation is involved in this litigation.

Apart from Marathon's constitutional claims, I do conclude that Marathon is entitled to judicial review of the MMS orders pursuant to § 704 of the Administrative Procedure Act without awaiting further administrative proceedings. The federal defendants at an earlier stage of this proceeding had urged that judicial review was now inappropriate because Marathon had failed to exhaust administrative remedies. The federal defendants have since withdrawn the claim of lack of administrative finality and have agreed that judicial review of the administrative proceedings is now appropriate, and I so hold.

SCOPE OF REVIEW

Since the federal defendants have moved for summary judgment in this case, the test is whether, with respect to any dispositive issue, there is any genuine issue as to any material fact.[15] If not, I must decide whether, construing the evidence in the light most favorable to the plaintiff Marathon, the defendants are entitled to judgment as a matter of law.

Section 706 of the Administrative Procedure Act (APA) establishes the appropriate standard of judicial review of agency decision. Under that provision, the agency's determination must be set aside if found to be arbitrary or capricious, or in violation of constitutional, statutory, or procedural requirements.[16]

Given my earlier rejection of Marathon's constitutional claims, I must now make a three-part determination.[17] First, did the agency act within the scope of its statutory authority? In making this inquiry, I need only determine whether the agency was in substantial compliance with the applicable statute(s).[18] Second, was the agency decision "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"?[19] As the Supreme Court has observed:

> To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.[20]

Third, did the agency comply with all procedural requirements?[21]

In reviewing an agency decision, the agency's own interpretation of the applicable statutes is entitled to substantial deference.[22] Deference is even more clearly in order where an administrative regulation, rather than a statute, is involved.[23]

---

**15.** *Fruehauf Corp. v. Royal Exchange Assurance of America, Inc.,* 704 F.2d 1168, 1171 (9th Cir. 1983).

**16.** 5 U.S.C. § 706(2)(A)–(D). Subsections (2)(E) and (2)(F) of § 706 apply only under a limited set of circumstances not relevant here. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414–15, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971).

**17.** *Overton Park,* 401 U.S. at 415–17, 91 S.Ct. at 823–24, *Arizona Past and Future Foundation, Inc. v. Lewis,* 722 F.2d 1423, 1425 (9th Cir.1983).

**18.** *MarkAir, Inc. v. Civil Aeronautics Board,* 744 F.2d 1383, 1385 (9th Cir.1984).

**19.** 5 U.S.C. § 706(2)(A).

**20.** *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823 (citations omitted).

**21.** In this case, Marathon does not challenge the MMS orders on the basis of procedural error.

**22.** *Chevron, U.S.A., Inc. v. NRDC,* ⸺ U.S. ⸺, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Blum v. Bacon,* 457 U.S. 132, 141–42, 102 S.Ct. 2355, 2361–62, 72 L.Ed.2d 728 (1982); *MarkAir, Inc. v. Civil Aeronautics Board,* 744 F.2d 1383, 1385 (9th Cir.1984); *Olivares v. Immigration and Naturalization Service,* 685 F.2d 1174, 1177 (9th Cir.1982).

**23.** *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965).

According to the Supreme Court, "the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." [24]

■ To uphold the MMS orders, I need not find that the MMS's interpretation of the statutes and regulations is the only reasonable interpretation, nor that it is the interpretation a court would reach if initially faced with the question. I need only find that it is *a* reasonable interpretation.[25] I must ascertain whether MMS "articulate[d] a rational connection between the facts found and the choice made." [26]

## DISCUSSION

Although Marathon has articulated a wide variety of claims and arguments in this case, the focus of the dispute centers upon whether MMS has the authority to use the net back theory of valuation for computing royalties on the gas delivered to the Nikisi LNG plant.

The Mineral Lands Leasing Act,[27] enacted in 1920 and amended since, governs federal oil and gas leases. The Act was intended "to promote wise development of natural resources and to obtain for the public reasonable financial returns on assets belonging to the public." [28] The gas leases at issue in this case were granted under the authority of the Mineral Lands Leasing Act and by their terms are "sub-ject to the terms and provisions of" the Act.[29]

Between 1976 and 1981, the General Accounting Office (GAO) issued several reports documenting problems in federal oil and gas royalty management and collection.[30] The October 1981 report identified the shortcomings:

Historically, the Geological Survey has not placed a high priority on collecting oil and gas royalties. Because sufficient management attention has not been focused on correcting deficiencies previously reported, financial management problems existing 20 years ago persist today. As a result, the Geological Survey is not collecting all oil and gas royalties; hundreds of millions of dollars owed the Government may be going uncollected each year. Moreover, millions of dollars in royalty income are not collected when due, thus increasing the Government's interest costs.[31]

In July 1981, the Secretary of the Interior established the Commission on Fiscal Accountability of the Nation's Energy Resources (known as the Linowes Commission) to investigate the problems. The Commission issued its lengthy report in January 1982, detailing 60 recommendations for revising the system.[32] The report summarized:

Management of royalties for the Nation's energy resources has been a failure for more than 20 years. Because the

**24.** *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *see also Hoover & Bracken Energies, Inc. v. United States Department of the Interior,* 723 F.2d 1488, 1489 (10th Cir.1983) (according considerable deference to Department of Interior's interpretation of what is now 30 C.F.R. § 206.-103), *cert. denied,* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984).

**25.** *American Paper Institute, Inc. v. American Electric Power Service Corp.,* 461 U.S. 402, 422–23, 103 S.Ct. 1921, 1932–33, 76 L.Ed.2d 22 (1983).

**26.** *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Kunaknana v. Clark,* 742 F.2d 1145, 1151 (9th Cir.1984).

**27.** 30 U.S.C. §§ 181–287 (1982).

**28.** *Mountain States Legal Foundation v. Andrus,* 499 F.Supp. 383, 392 (D.Wyo.1980).

**29.** *See* leases reprinted in A.R. 14.

**30.** *See* GAO, Oil and Gas Royalty Collections—Longstanding Problems Costing Millions (Oct. 29, 1981), A.R. 56; GAO, Oil and Gas Royalty Collections—Serious Financial Management Problems Need Congressional Attention (April 13, 1979), A.R. 57; GAO Indian Natural Resources—Part II: Coal, Oil, and Gas, Better Management Can Improve Development and Increase Indian Income and Employment (Mar. 31, 1976), A.R. 58.

**31.** A.R. 56 at 1.

**32.** A.R. 55.

Federal government has not adequately managed this multibillion dollar enterprise, the oil and gas industry is not paying all the royalties it rightly owes. The government's royalty recordkeeping for Federal and Indian oil and gas leases is in disarray. For this reason, the exact amount of underpayment is unknown. The results of individual audits, which have often uncovered large underpayments, suggest that hundreds of millions of dollars due the U.S. Treasury, the States, and Indian tribes are going uncollected every year.

. . . .

The Nation can no longer afford mismanagement of royalties for its energy resources. The stakes are too high. With the rapid escalation of energy prices, oil and gas royalties have risen from less than $500 million in 1971 to more than $4 billion in 1981.

The government's royalty management system needs a thorough overhaul.[33]

Both the Secretary of the Interior and Congress responded to the Linowes Commission report. The Secretary reorganized the royalty management and collection functions of the Department under the newly-created Minerals Management Service, and revised the fiscal and production accounting system.

Congress, on December 21, 1982, enacted the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA).[34] The express purpose of FOGRMA included:

(1) to clarify, reaffirm, expand, and define the responsibilities and obligations of lessees, operators, and other persons involved in transportation or sale of oil and gas from the Federal and Indian lands and the Outer Continental Shelf;

(2) to clarify, reaffirm, expand, and define the authorities and responsibilities of the Secretary of the Interior to implement and maintain a royalty management system for oil and gas leases on Federal lands, Indian lands, and the Outer Continental Shelf;

(3) to require the development of enforcement practices that ensure the prompt and proper collection and disbursement of oil and gas revenues owed to the United States and Indian lessors and those inuring to the benefit of States;[35]

The legislative history of FOGRMA provides additional evidence that the law was intended to ensure that oil and gas royalties were accurately and promptly assessed and collected.[36] In FOGRMA, Congress mandated that the Secretary audit oil and gas lease accounts and make additional collections as warranted.[37] Furthermore, the statute states that "[t]he Secretary shall give priority to auditing those lease accounts identified by a State or Indian tribe as having significant potential for underpayment."[38]

Under the Minerals Lands Leasing Act, "[t]he Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of [the Act]."[39] These regulations have the force and effect of statutes when not in conflict with such statutes.[40] The leases at issue in this case, in addition to being subject to the terms of the Mineral Lands Leasing Act, are also "subject ... to all reasonable regulations of the Secretary of the Interior now or hereafter in force" unless inconsistent with the leases themselves.[41]

33. *Id.* at xv.

34. 30 U.S.C. §§ 1701–1757 (1982).

35. *Id.* § 1701(b).

36. *See* H.R.Rep. No. 859, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News 4268–4300; *see also* legislative history materials reprinted in A.R. 54.

37. 30 U.S.C. § 1711(c)(1).

38. *Id.*

39. 30 U.S.C. § 189.

40. *California Co. v. Seaton,* 187 F.Supp. 445, 449 (D.D.C.1960), *aff'd sub nom. California Co. v. Udall,* 296 F.2d 384 (D.C.Cir.1961).

41. *See* leases reprinted in A.R. 14.

Administrative regulations governing MMS are found in 30 C.F.R. ch. II (1984). The particular regulation at issue in this case is 30 C.F.R. § 206.103, which provides:

§ 206.103 Value basis for computing royalties.

The value of production, for the purpose of computing royalty, shall be the estimated reasonable value of the product as determined by the Associate Director due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters. Under no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than the value computed on such reasonable unit value as shall have been determined by the Secretary. In the absence of good reason to the contrary, value computed on the basis of the highest price per barrel, thousand cubic feet, or gallon paid or offered at the time of production in a fair and open market for the major portion of like-quality oil, gas, or other products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value.

Under this regulation, royalties are to be based on "the estimated reasonable value of the product as determined by the Associate Director [for Royalty Management]" with the proviso that "[u]nder no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof."

The regulation enumerates several factors to be considered in determining reasonable value, but does not mandate that any particular formula be used to compute reasonable value. In fact, the Associate Director is expressly directed to consider, in addition to the enumerated factors, "other relevant matters." The thrust of the regulation is that the value for royalty computation purposes set by the Associate Director must be reasonable. The only specific requirement in the regulation is that this value be no less than "gross proceeds." Thus this regulation vests considerable discretion in the Associate Director to decide what the "reasonable value" for royalty purposes shall be.[42]

The federal gas leases at issue in this case are by their own terms "subject to the terms and provisions of [the Mineral Lands Leasing Act] and to all reasonable regulations of the Secretary of the Interior now or hereafter in force, when not inconsistent with any express and specific provisions herein."[43] The leases also provide that the lessee shall pay the lessor "12 ½ percent royalty on the production removed or sold from the leased lands computed in accordance with the Oil and Gas Operating Regulations."[44] The leases further state:

It is expressly agreed that the Secretary of the Interior may establish reasonable minimum values for purposes of computing royalty on any or all oil, gas, natural gasoline, and other products obtained from gas, due consideration being given to the highest price paid for a part of for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters and, whenever appropriate, after notice and opportunity to be heard.[45]

Both the regulations and the leases, as discussed above, vest in the administrative agency the authority to establish the basis for computing royalties. The regulations require that the basis for royalty purposes "shall be the estimated reasonable value of

**42.** *See Continental Oil Co. v. United States,* 184 F.2d 802, 821 (9th Cir.1950).

**43.** *See, e.g.,* Lease No. 028056 at 1, attached as Exhibit A to Marathon's Amended Complaint (filed Sept. 4, 1984).

**44.** *Id.* at 2.

**45.** *Id.*

the product as determined by the Associate Director." The leases expressly provide that "the Secretary of the Interior may establish reasonable minimum values for purposes of computing royalty."

As a preliminary matter, Marathon suggests that MMS by reason of prior agency action may well have been estopped from making the July 8 and October 5 orders. In support of this position, Marathon relies upon the February 6, 1981 settlement agreement and the September 10, 1979 "Duletsky Memo."

As to the settlement agreement,[46] it was by its terms effective "until such time as change in market conditions, State or Federal law, or regulations adopted thereunder ... necessitate a revision in the method used to determine the well-head value." [47] By January 1983, MMS determined that such changes in market conditions had occurred. In December 1982, Marathon executed a new contract with Alaska Pipeline Company (APL to sell its gas from the Kenai Unit and other nearby units at a base price of $2.32/Mcf. This price is in contrast to the $2.0149/Mcf Phillips formula price, and the $.586/Mcf price under the 1975 APL contract.[48] The higher prices being paid for Kenai gas under the new sales contracts were an indication to MMS that the settlement agreement no longer reflected the true value of the gas delivered to the LNG plant. I conclude that the terms of the provision in the settlement agreement expressly provided for revision in the event of a change in market conditions. Therefore, the February 6, 1981 settlement agreement in no way precluded

MMS from later proposing a revised method of valuation.

Turning to the "Duletsky Memo," [49] I likewise conclude that this document did not bind the federal defendants to a fixed and unalterable position. This memorandum constituted the response of John Duletsky, Acting Chief, Conservation Division of USGS, to an internal inquiry about how to value Kenai gas for royalty purposes. Duletsky discussed the applicability of a net back method of valuation to satisfy the requirement that the value be not less than gross proceeds, and then concluded: "The term 'gross proceeds' ... in our opinion, would be impractical to administer with respect to the Marathon [LNG] situation." [50]

I interpret Duletsky's position to be precisely as stated—that the use of the net back method was determined to be "impractical" when he authored the memorandum of September 10, 1979. Duletsky did not maintain that the gross proceeds regulation was not applicable to the LNG, nor could he rule out the possibility that the situation might change. In his memorandum Duletsky specifically noted that the agency "should also seek to establish a rational relationship between the landed value of the LNG in Japan and the value at the unit for royalty computation purposes so that the value for royalty purposes may be adjusted whenever there is an increase in the landed price." [51] In this statement, Duletsky acknowledged the relevance of the sales price in Japan to determination of value for royalty purposes. In fact, the settlement agreement of February 1981 es-

---

**46.** Letter of Feb. 6, 1981 from James P. Murphy, Marathon Oil Co., to Barry A. Boudreau, USGS, A.R. 145.

**47.** *Id.* at 3.

**48.** *See* Federal Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment and Dismissal at 21–24 (filed Dec. 17, 1984) [hereinafter cited as Federal Defendants' Memorandum in Support]. Although Marathon refers to this discussion of contract prices as *"post hoc* rationalization,"Marathon does not allege that the facts cited by MMS are incorrect. *See* Memorandum

of Marathon in Opposition to Motion of Federal Defendants for Summary Judgment and Partial Dismissal at 54–55 (filed Jan. 2, 1985) [hereinafter cited as Memorandum of Marathon in Opposition].

**49.** Memorandum of Sept. 10, 1979 from John Duletsky, Acting Chief, Conservation Division, USGS, to Oil and Gas Supervisor, Anchorage, Alaska, A.R. 124.

**50.** *Id.* at 2.

**51.** *Id.* at 4.

tablished a basis for computing value for royalty purposes based on percentage of price paid in Japan for LNG.

I cannot agree with Marathon's contention that the Duletsky memorandum constituted an "express finding that the [gross proceeds] clause has no application to Marathon's LNG gas." [52] Given MMS's ongoing responsibility to ensure collection of all royalties due, I conclude the Duletsky memorandum represented nothing more than the position adopted at that time limited to the precise circumstances then existing.

■ The doctrine of equitable estoppel is applied to the government only under unusual circumstances.[53] Courts are especially reluctant to estop the government in cases involving rights to public lands.[54] Estoppel will be applied only "if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged." [55] In this case, Marathon has not alleged any "serious injustice" resulting from MMS's decision to use the net back method to comply with the gross proceeds requirement in the regulation. Furthermore, the public treasury would suffer if these royalties due from gas leases on federal lands were not collected as due. I conclude that neither the 1981 settlement agreement nor the 1979 Duletsky memorandum precluded the agency from making its July and October orders. The question then becomes whether the valuation method adopted by MMS satisfies statutory and regulatory requirements and whether it is consistent with the leases.

The regulation [56] requires that the value of production for royalty purposes be not less than "the gross proceeds accruing to the lessee from the sale thereof." The phrase "gross proceeds" is not defined in the regulations. Marathon claims that the gross proceeds provision operates only to require that the value for royalty purposes include any additional sums, such as tax reimbursements, received by the lessee from the purchaser of the gas.[57]

I do not agree that the phrase should be so narrowly interpreted. One treatise defines "proceeds" as "the money obtained by an actual sale." [58] Marathon differentiates between "proceeds" type royalty clauses and "wellhead value" royalty clauses.[59] According to Marathon, the clause at issue here is a "wellhead value" royalty clause, and therefore the royalty value must be based on actual sales price in the field. I agree that the first sentence of the regulation directs the Associate Director to look to sales price in the field. However, the regulation does not end there. In the second sentence, it requires that the royalty basis be not less than the gross proceeds accruing to the lessee. Thus this regulation combines characteristics of a "wellhead value" royalty clause with characteristics of a "proceeds" type royalty clause. By its own language, the provision aims to ensure that the gross proceeds accruing to the lessee is the absolute minimum value for computation of royalties. In describing a "proceeds" type royalty clause, Professor Hemingway states: "Royalty payable upon the 'proceeds' of the sale of gas will be computed on the basis of aggregate gross receipts from all products less the costs of marketing and transportation." [60]

**52.** *See* Marathon's Supplemental Memorandum in Opposition to the Federal Defendants' Motion for Summary Judgment and Partial Dismissal at 14 (filed Jan. 16, 1985) [hereinafter cited as Marathon's Supplemental Memorandum in Opposition].

**53.** *Union Oil Co. v. Morton*, 512 F.2d 743, 748 n. 2 (9th Cir.1975).

**54.** *Id.*

**55.** *Id.* (quoting *United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9th Cir.1973)).

**56.** 30 C.F.R. § 206.103 (1984).

**57.** Marathon's Supplemental Memorandum in Opposition, *supra* note 52, at 8–9.

**58.** 8 H. Williams & C. Meyers, *Oil & Gas Law: Manual of Oil & Gas Terms* 572 (1982).

**59.** Memorandum of Marathon in Opposition, *supra* note 48, at 17–19.

**60.** R. Hemingway, *The Law of Oil and Gas* § 7.4, at 351· (2d ed. 1983).

The gas Marathon delivers to the LNG plant is neither sold at the wellhead, nor at the LNG plant. Thus there is no simple way for MMS to value this production. The first arm's-length transaction involving this gas is the sale of the LNG in Japan. Recent changes in economic conditions suggested to MMS that neither the contract price for gas sold to Alaska Pipeline Co., nor the Phillips formula set out in the 1981 settlement agreement, represented a "reasonable value" for royalty computation purposes. MMS gave "due consideration" to the various factors and information before it in arriving at its decision.[61] To capture the true value of the LNG being sold in Japan, MMS determined it was necessary to look at the landed price in Japan and work back to arrive at a reasonable wellhead value. To do this, MMS proposed to make allowances for costs of liquefaction and transportation, and for a reasonable rate of return on the LNG plant. Deducting these allowances from the sales price in Japan would thus yield an estimated wellhead value for the gas.

Is there "good reason" supporting MMS's decision to look to the sales price in Japan, rather than to open market contracts for the sale of other gas from the Kenai field? Again, I conclude yes. The regulation provides:

> In the absence of good reason to the contrary, value computed on the basis of the highest price per ... thousand cubic feet ... paid or offered at the time of production in a fair and open market for the major portion of like-quality ... gas ... produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value.

Marathon contends that this provision should be followed to arrive at a reasonable value of gas delivered to the LNG plant for royalty purposes.[62] I conclude, however, that there exists "good reason to the contrary" warranting use of another method.

By its terms, the provision refers to "the price ... paid or offered at the time of production in a fair and open market for the major portion of like quality ... gas ... produced and sold from the field or area." This assumes that reasonable value can be ascertained based on arm's-length transactions negotiated by unrelated parties each acting in their own self interest in competition with others.

It is obvious that market value of gas in any field will vary depending upon a wide variety of factors. So far as the Kenai field is concerned, 42% of the gas produced in 1982 was delivered to the ammonia and urea plant at Nikiski owned by Collier Chemical, a subsidiary of Union Oil. An additional 16% of production was delivered to the LNG plant owned by Marathon and Phillips. Alaska Pipeline Company bought 31% of production for distribution in the Anchorage market and 9% of production was rented to the Swanson River Field Unit for pressure maintenance. The gas delivered to the LNG plant presents a special, unique situation. At the plant the gas is cooled until it becomes liquid, then transported to Japan, and there sold. To capture the true value of this gas, it is reasonable for MMS to look to the proceeds accruing to Marathon in Japan.

The regulation requires that "Under no circumstances shall the value of production ... for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale ... or less than the value computed on such reasonable unit value as shall have been determined by the Secretary." Did MMS satisfy the explicit requirement that the value for royalty purposes be not less than the "gross proceeds" accruing to Marathon from the sale of the gas? I conclude the answer is yes. In fact, MMS determined that the net back method was necessary to satisfy the gross proceeds requirement. I agree with this determination.

**61.** *See* Transcript of Deposition of Robert E. Boldt, Dec. 13, 1984 [hereinafter cited as Boldt Deposition].

**62.** *See* Memorandum of Marathon in Opposition, *supra* note 48, at 22–24.

Obviously the February 1981 settlement agreement demonstrates that the price paid for gas by Alaska Pipeline on its long-term contract failed to provide reasonable value for purposes of computing royalty on that portion of the gas delivered to the LNG plant for sale in Japan. Even under the so called Phillips formula of 36% of the price received in Japan, the additional royalties from January 1, 1980 through February 1981 were computed to be $1,834,160.00. Thus Marathon's argument that "the 'gross proceeds' received by the lessee from the sale of [the LNG] with its enhanced values in a distant market are not indicative of the value of the raw material feedstock gas produced at the lease"[63] has a hollow ring. Since January 1, 1980, the effective date of the settlement agreement, Marathon paid royalties based on a "value" derived from the sales price in Japan. Marathon expressly agreed to this method in the February 1981 settlement agreement. Marathon cannot now credibly argue that landed sales price in Japan is irrelevant to the reasonable value for purposes of computing royalties.

Is MMS's net back method consistent with the regulatory language directing the agency to determine the "value *of production*" for royalty purposes? Marathon argues that this language requires that royalties be based on the value of production *at the lease*.[64] I agree with this basic premise. However, nothing in the regulation precludes MMS from looking at the sales price in Japan as a means to determine the reasonable value of production at the lease. MMS has done just this by taking the landed sales price, making allowances for liquefaction and transportation costs, and thereby deriving a reasonable value at the lease. The regulation does not preclude such computations, but rather requires them to ensure that the value chosen is not less than the gross proceeds accruing to the lessee. Thus I conclude that in deriving a value for royalty purposes from the sales price in Japan, MMS complied with the regulatory requirement that royalties be based on the "value of production."

MMS is charged with managing these national resources and ensuring that full royalties are levied and collected. Deriving an estimated wellhead value from the sales price of the LNG in Japan is, I conclude, a reasonable method of establishing a basis for computing royalties.

Furthermore, contrary to Marathon's assertions, the MMS orders do not represent a "stark departure" from previous agency positions.[65] As early as October 1977, the government took the position that to satisfy the gross proceeds provision, value for royalty purposes should be derived from the sales price in Japan.[66]

Does the regulation permit MMS to look to the sales price of LNG, a liquefied substance, in determining the value for royalty purposes of the natural gas at the lease? I conclude it does. Marathon contends that the LNG sold in Japan is a manufactured product quite distinct from the natural gas at the wellhead.[67] I am not persuaded. LNG is natural gas that has been cooled for purposes of storage or shipment.[68] There is no alteration of the chemical properties of the gas. Regardless of whether liquefaction is termed "processing" or "manufacturing," the fact remains that the LNG delivered in Japan is chemically identical to the natural gas at the lease. Therefore MMS did not violate the regulation when it directed that the royalty basis for the gas be derived from the sales price of the LNG in Japan.

█ For these reasons, I conclude that the MMS orders directing Marathon to use

**63.** Marathon's Supplemental Memorandum in Opposition, *supra* note 52 at 9.

**64.** *See id.* at 7–8.

**65.** *See* Memorandum of Marathon in Opposition, *supra* note 48, at 7–8.

**66.** *See* Letter of Oct. 31, 1977 from Rodney A. Smith, USGS, to John R. South, Marathon Oil Co., A.R. 100.

**67.** *See* Memorandum of Marathon in Opposition, *supra* note 48, at 37–41.

**68.** *See* 8 H. Williams & C. Meyers, *Oil & Gas Law: Manual of Oil & Gas Terms* 405 (1982).

the net back method fall within the agency's authority under the statutes and regulations. I also conclude that the orders neither violated nor were inconsistent with provisions of the leases. The leases by their express terms provide for a royalty to be paid "on the production removed or sold from the leased lands computed in accordance with the Oil and Gas Operating Regulations."[69] Marathon argues that like the regulatory language, this lease language requires royalties to be computed on value of production *at the lease*.[70] However, I have concluded that the net back method is a valid means of estimating the value of production for royalty purposes. Moreover, the leases themselves provide that the Secretary of the Interior has the authority to establish reasonable values for computation of royalties. I conclude that the MMS orders did not violate the terms of the leases.

In addition to challenging the substance of the MMS orders, Marathon also argues that the orders are invalid because MMS was unduly influenced by CIRI.[71] Marathon cites two Memoranda of Understanding (MOUs) between MMS and CIRI.[72] Marathon claims that by entering into the MOUs with CIRI, MMS violated a provision of ANCSA preserving existing rights of lessees of federal lands conveyed to native corporations,[73] and unlawfully delegated administrative authority and discretionary decisionmaking to CIRI, a private party.

MOU I was executed by Robert E. Boldt, Associate Director of Royalty Management for MMS, on January 3, 1983.[74] In the agreement, MMS made a partial waiver of administration of the leases to CIRI to enable CIRI to negotiate directly with Marathon and Union Oil Co., the lessees, to try to settle royalty and other disputes, and, if necessary, to bring suit in its own name.[75] MOU I also provides that CIRI may request that MMS audit the leases, and that MMS shall consult with CIRI regarding any lease matters which might affect CIRI's interests.[76]

I conclude that in executing MOU I, MMS did not unlawfully delegate its authority or otherwise violate Marathon's rights or interests. Paragraph 2 of the agreement lists areas of dispute between CIRI and the two lessees, Marathon and Union, primarily concerning royalties. The agreement itself states that "[this] partial waiver of administration is with regard to CIRI's negotiation of CIRI's interest in the Leases ... with respect to the unresolved issues listed in paragraph 2(a) through (e). By this partial waiver CIRI is empowered to enter into negotiations and effect a settlement of those issues...." ANCSA § 14(g) expressly authorizes the responsible agency to waive administration of leases on land conveyed pursuant to ANC-

---

**69.** *See* Lease No. 028056 at 2, attached as Exhibit A to Marathon's Amended Complaint (filed Sept. 4, 1984).

**70.** Marathon's Supplemental Memorandum in Opposition, *supra* note 52, at 4–7.

**71.** *See* Memorandum of Marathon in Opposition, *supra* note 48, at 24–31; Marathon's Supplemental Memorandum in Response to Reply Memorandum of Cook Inlet Region, Inc. at 2–11 (filed Jan. 23, 1985).

**72.** Memorandum of Understanding Between Minerals Management Service & Cook Inlet Region, Inc. (Jan. 3, 1983), A.R. 17 [hereinafter cited as MOU I]; Memorandum of Understanding II Between Minerals Management Service and Cook Inlet Region, Inc. (Aug. 9, 1983), A.R. 18 [hereinafter cited as MOU II].

**73.** ANCSA § 14(g), 43 U.S.C. § 1613(g) (1982).

**74.** *See* MOU I, A.R. 17.

**75.** *Id.* ¶¶ 2, 3.

**76.** *Id.* ¶¶ 4, 6, 7. In addition, paragraph 5 of the agreement stated that the determinations in USGS *letters dated October 1, 1979 and Novem*ber 6, 1979 were withdrawn and rescinded insofar as they affected CIRI's interests. The administrative record contains several letters from USGS to Union Oil Company bearing these dates, *see* A.R. 126, 128, 129, but only one letter to Marathon. *See* Letter of Nov. 6, 1979 from Rodney A. Smith, USGS, to Marathon Oil Co., A.R. 127. As the federal defendants and CIRI point out, this November 6 letter was expressly rescinded by USGS one month later. *See* Letter of Dec. 11, 1979 from Rodney A. Smith, USGS, to Marathon Oil Co., A.R. 130. Marathon has not refuted this, and therefore has not explained how paragraph 5 of MOU I could have adversely affected its interests.

SA, such as the land on which these leases are located.[77] The plain language of MOU I indicates that the purpose of the waiver was to enable CIRI to negotiate an out of court settlement of the royalty issues. MMS did not unlawfully transfer any decisionmaking authority to CIRI.

The provisions in MOU I providing that CIRI may request an audit, and that MMS shall consult with CIRI, likewise do not violate Marathon's rights. ANCSA provides that the native land settlement process should be accomplished "with maximum participation by Natives in decisions affecting their rights and property."[78] Thus MMS is not only entitled but in fact expressly directed to communicate with CIRI concerning the leases. Furthermore, any private party has the right to make its opinions known to the government and to advocate positions which would be to its benefit.

But there is additional evidence to support my conclusion that MOU I did not improperly influence MMS's decisionmaking process. In his sworn deposition testimony, Robert E. Boldt, MMS's Associate Director for Royalty Management, state in response to several direct questions that MOU I did not influence or affect MMS's decision to issue the royalty orders at issue here.[79]

In MOU II, executed on August 9, 1983,[80] MMS adopted several "administrative standards" governing the leases.[81] Marathon argues that by adopting these standards, MMS unlawfully contractually committed itself to certain positions, thereby abdicating its responsibility for independent decisionmaking. However, the initial MMS order directing Marathon to use the net back method to compute royalties was issued on July 8, 1983, one month before MOU II was signed.[82] Thus MOU II could hardly have influenced MMS's decision to issue the July 8 royalty order. Furthermore, the July 8 order established the values to be used in the computation of royalties using the net back method. The decision to use that method had been made and so communicated to Marathon months earlier in the January 6, 1983 letter. The two subsequent MMS orders at issue in this case, dated October 5, 1983 and June 11, 1984, merely directed Marathon to comply with previous orders.[83] These subsequent orders were thus similarly not the result of any improper influence caused by MOU II.

I thus conclude that the MOUs between MMS and CIRI did not unlawfully influence the issuance of the MMS royalty orders. MMS neither contracted to take action beyond that already mandated by law, nor agreed to refrain from exercising its independent decisionmaking authority. The MMS net back royalty orders to Marathon are not invalidated by the MOUs.

Marathon raises several other complaints about the procedure by which MMS issued its orders. Marathon objects to the Administrative Record compiled and submitted by the federal defendants.[84] According to Marathon, there are documents in the record which should not be there, and certain documents are excluded which should be included. In particular, Marathon claims that "[m]uch of the so-called 'record' contains *post hoc* rationalizations,"[85] and points to documents created after the MMS royalty order(s) had been issued.

**77.** 43 U.S.C. § 1613(g) (1982).

**78.** *Id.* § 1601(b).

**79.** Boldt Deposition, *supra* note 61, at 42, 46, 69, 96, 98, 110.

**80.** A.R. 18.

**81.** *Id.* ¶¶ 3, 4.

**82.** *See* Letter of July 8, 1983 from William H. Feldmiller, MMS, to Curtis Dowden, Marathon Oil Co., A.R. 8.

**83.** *See* Letter of October 5, 1983 from Milton K. Dial, MMS, to D.J. Durham, Union Oil Co. (as agent for Marathon Oil Co.), A.R. 9; Letter of June 11, 1984 from Assistant Secretary for Land and Minerals Management, Department of the Interior, to William E. Swales, Marathon Oil Co. and Ray A. Burke, Union Oil of California, A.R. 11.

**84.** *See* Memorandum of Marathon in Opposition, *supra* note 48, at 32–37.

**85.** *Id.* at 35.

In a case such as this, the court is reviewing the agency's determination. There is no statutory requirement for formal rulemaking or adjudicatory proceedings. Therefore there is no formal agency record created to support the decision. Despite the absence of a formal record, it is the duty of the court to review the decision "based on the full administrative record that was before the [decisionmaker] at the time he made his decision."[86]

The federal defendants have compiled an admittedly voluminous administrative record in this case. As explained in their memorandum, "[t]he Department ... accumulated all documents which it considered to have even the slightest relevance to the determination, seeking to avoid any controversy with regard to the record."[87] The response from Marathon was that the record was *too* voluminous.

I cannot agree with Marathon. I do not find deficiencies in the administrative record that would require an evidentiary hearing on the issue of the composition of the record. The omission Marathon complains of is that the appeal documents it filed with the agency were not included in the record. The federal defendants have since supplemented the record to include those documents.[88] As to Marathon's claim that documents were included which were created after the initial royalty order was issued, I find no prejudice to Marathon. According to the federal defendants, these documents were included because they support the subsequent orders and the Notice of Noncompliance issued to Marathon.[89] Such additions do not invalidate

agency action unless substantial prejudice is shown to result.[90] Beyond the complaint that the record is too large, Marathon has not alleged that it suffered any substantial prejudice from the inclusion of these documents. Additional explanatory information is permitted to supplement the record.[91]

Marathon also claims that the MMS orders may have been improperly influenced by communications from congressional representatives.[92] However, Mr. Boldt, in his deposition, stated that any such communications occurred in April or May of 1984, almost a year after MMS issued its first royalty order.[93] Thus congressional communications could not have affected MMS's decision to issue the disputed royalty order.

In another claim, Marathon contends that by using different methods for valuing Marathon's gas delivered to the LNG plant and Union Oil Company's gas delivered to its ammonia/urea plant, MMS has violated Marathon's equal protection rights.[94] I do not agree. As discussed earlier, LNG is natural gas that has been cooled for shipment and storage purposes. It is chemically identical to the gas produced at the well. At least in this connection, it differs from ammonia or urea which are quite different products from LNG. But in each case, MMS is required to follow the regulation and determine the reasonable value for royalty purposes, with gross proceeds as the required minimum. There is no requirement that the gas delivered to the LNG plant be valued by the same method as the gas delivered to the ammonia/urea plant so long as the agency complies with the regulation.

86. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971).

87. Federal Defendants' Reply to Plaintiff's Opposition to Motion for Summary Judgment at 11 (filed Jan. 11, 1985) [hereinafter cited as Federal Defendants' Reply Memorandum].

88. *See* Notice of Lodging Supplement to Administrative Record (filed Jan. 22, 1985).

89. *See* Federal Defendants' Reply Memorandum, *supra* note 87, at 12.

90. *United States v. Pierce Auto Freight Lines, Inc.,* 327 U.S. 515, 530, 66 S.Ct. 687, 695, 90 L.Ed. 821 (1946).

91. *Kunaknana v. Clark,* 742 F.2d 1145, 1149 (9th Cir.1984); *Asarco, Inc. v. United States Environmental Protection Agency,* 616 F.2d 1153, 1158–60 (9th Cir.1980).

92. *See* Memorandum of Marathon in Opposition, *supra* note 48, at 45.

93. *See* Boldt Deposition, *supra* note 61, at 116.

94. *See* Memorandum of Marathon in Opposition, *supra* note 48, at 48–51.

Marathon claims that MMS irrevocably waived administration of one of CIRI's leases in the Kenai unit, Lease A–028142.[95] In support, Marathon cites an August 1982 letter from MMS to Union Oil Co.[96] In this letter, MMS notified Union that the lands covered by part or all of three leases had been conveyed to CIRI pursuant to ANCSA. As to the two leases which had been only partially conveyed, MMS explicitly stated that administration would remain with MMS and that lease records were to be retained by MMS.[97]

> As to the third lease, the letter stated: Lease A–028142 has been transferred in its entirety to the Cook Inlet Region Inc. ... [ANCSA § 14(g) provides that the United States may waive administration of a lease containing lands which have been conveyed in their entirety.
>
> Pursuant to the above, your case file will be transferred ... to: Cook Inlet Region, Inc. ... Further correspondence concerning these leases should be made to [CIRI].[98]

Although in the letter MMS stated that the United States "may" waive administration as to this lease, there is no language indicating that the United States has in fact waived administration. The applicable regulation provides that the agency may retain administration of a lease conveyed in its entirety if the agency finds it to be in the interest of the United States.[99] Marathon contends that no such finding has been made, but offers no evidence in support of this contention. The regulation does not require that such a finding be made in a formal written document. In oral argument, counsel for the federal defendants suggested that MMS has continued to administer this lease.[100]

The August 1982 letter provided that the lease had been transferred in its entirety, and that the case file would be transferred

to CIRI. MMS did not state, however, that it was waiving administration. Because the terms used are prospective, I conclude that MMS has not waived administration as to this lease. Therefore the MMS royalty orders are effective as to this lease.

CONCLUSION

For the reasons stated I upheld the orders issued by MMS to Marathon requiring computation of royalties using the net back method. Based on this holding, I GRANT the federal defendants' Motion for Summary Judgment and Partial Dismissal. Marathon's claims against the federal defendants are accordingly DISMISSED. I further find that the federal defendants are entitled to an injunction. Marathon is accordingly ORDERED to comply with the terms of the three MMS royalty orders. I DENY Marathon's Motion for a Preliminary Injunction and Judicial Stay of Administrative Action. I GRANT the federal defendants' prayer for an accounting to determine royalties due from Marathon. I retain jurisdiction to enter judgment for the United States when the amount has been ascertained, and to determine any remaining matters.

The federal defendants shall, within five days, serve and file a proposed Order consistent with this Opinion. Because I order Marathon to comply with the royalty orders, this decision is appealable as an injunction under 28 U.S.C. § 1292(a). Enforcement of this injunction is stayed for a period of ten days from the date the Order is signed and filed to enable Marathon to apply to the Court of Appeals for a stay pending appeal.

---

**95.** Marathon's Supplemental Memorandum in Opposition, *supra* note 52, at 21–22.

**96.** Letter of Aug. 25, 1982 from Jimmy W. Mayberry, MMS, to Wayne Hunt, Union Oil Co. of California, included in A.R. 15.

**97.** *Id.* at 2.

**98.** *Id.* at 3.

**99.** 43 C.F.R. § 2650.4–3 (1983).

**100.** Reporter's Transcript of Oral Argument on Motions at 83 (Jan. 4, 1985).